CONTINENTAL OIL COMPANY,
Plaintiff-Appellee,

v.

BONANZA CORPORATION, and
Republic Insurance Company,
Defendants-Appellants.

No. 80–2317.

United States Court of Appeals,
Fifth Circuit.

June 16, 1983.

Jerre S. Williams, Circuit Judge, dissented and filed opinion in which Brown, Politz, Tate and Sam D. Johnson, Circuit Judges, joined.

Brown, Circuit Judge, concurred in part and dissented in part and filed opinion in which Tate, Circuit Judge, joined.

Vinson & Elkins, Harold K. Watson, Houston, Tex., for defendants-appellants.

Eastham, Watson, Dale & Forney, Marion E. McDaniel, Jr., Houston, Tex., for Bonanza Corp.

Baker & Botts, Randy McClanahan, Houston, Tex., S. Gene Fendler, Liskow & Lewis, New Orleans, La., for plaintiff-appellee.

Before CLARK, Chief Judge, BROWN, RUBIN, REAVLEY, POLITZ, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, and HIGGINBOTHAM, Circuit Judges.*

* Judges Thomas Gibbs Gee and Carolyn Dineen Randall recused themselves and, therefore, did not participate in this decision.

ALVIN B. RUBIN, Circuit Judge:

Conoco, the operator of an offshore drilling rig, chartered a vessel that, due to negligence of its master, sank beneath the rig. Conoco removed the wreck and seeks to recover the cost of removal under a marine protection and indemnity (P & I) insurance policy that covers amounts the vessel owner has become legally liable to pay and has paid either for removal when it is "compulsory by law" or "in connection with any fixed or movable object." Finding that Conoco's unilateral decision to remove the wreck was neither compulsory nor to avert legal liability, we reverse the district court decision ordering Conoco's indemnification.

Conoco also sought a declaration that Bonanza Corporation (Bonanza), the owner of the chartered vessel, was liable to it for the cost of removal because the vessel's sinking was caused by the negligence of the vessel's captain and deckhand, who were employees of Bonanza under Bonanza's exclusive control. The district court, 511 F.Supp. 62, held Bonanza liable and denied limitation of liability on the theory that the vessel's captain was Bonanza's managing agent with respect to the vessel's operations. Finding that the district court's findings of fact are adequately supported by the record and that the legal conclusions reached in those findings are correct, we affirm the denial of limitation.

## I.

### FACTS

Conoco time-chartered the Aqua Safari, a 65-foot vessel, fully manned, from Bonanza, to remain near a Conoco drill tender in the Gulf of Mexico, do standby duty, and carry messages, including daily drilling reports, between the drill tender and the drilling rig it served. Bonanza retained exclusive control of the vessel.

Both Conoco and Bonanza were named as assureds in a standard P & I policy issued by Republic Insurance Company (Republic) to cover the Aqua Safari's operations. The policy provided one million dollars in coverage for:

such sums as the assured, as owner[,] . . . shall have become legally liable to pay and shall have paid on account of:

Loss of, or damage to, or expense in connection with any fixed or movable object or property of whatever nature;

Costs or expenses of, or incidental to, the removal of the wreck of the vessel . . . when such removal is compulsory by law . . . .

While maneuvering alongside the drilling rig one morning, preparing to pick up a drilling report, the Aqua Safari became entangled in a steel cable hanging from the rig. The vessel drifted into one of the rig's legs, began taking on water in her aftercompartment, and sank directly beneath the rig. The Aqua Safari's captain and deckhand swam to safety.

Initially concerned that the sunken vessel might hamper the scheduled removal of the drilling rig fourteen days later, Conoco demanded that Bonanza remove the wreck. Bonanza refused, and announced that it abandoned all interest in the vessel. In spite of the wreck, the rig was moved without difficulty.

Conoco, however, continued to demand that Bonanza remove the wreck, which lay in 34 feet of water and was by then half-covered with mud. Conoco asserted that the sunken Aqua Safari interfered with installation of a permanent offshore platform on the site. Republic, as Bonanza's insurer, instructed Bonanza to turn a deaf ear to Conoco's request. Two and a half months after the sinking, when construction of the offshore platform began, Conoco raised the Aqua Safari with a derrick barge brought to the site for the platform's installation. It then moved the Aqua Safari to a Louisiana shipyard, incurring a total cost of $109,-000.

After raising the Aqua Safari, Conoco sued Bonanza and Republic for the cost of removal. Bonanza denied liability, but argued that, if it were held liable, it should be allowed the protection of the Limitation of Liability Act, 46 U.S.C. § 183 et seq. (1976).

Republic denied that the policy covered Conoco's removal of the wreck because Conoco was not the vessel's owner.

The district court held that Bonanza's negligence was the sole cause of the sinking of the Aqua Safari. It found that the vessel's captain was Bonanza's managing agent with respect to the Aqua Safari's operations. Although Bonanza could have limited its liability to Conoco for the cost of the Aqua Safari's removal if the vessel's sinking had occurred without Bonanza's privity and knowledge,[1] limitation was foreclosed here because the captain's negligence in navigating the vessel was attributable to the corporation as occurring with its privity and knowledge.

The district court found that Conoco could also proceed directly against Republic to recover the cost of removal. Because Conoco was an assured under the P & I policy covering the Aqua Safari, Conoco could claim the same rights as any other assured under that policy. Conoco was compelled by law to remove the Aqua Safari because its lease and federal regulations required removal of all equipment from its leasehold within one year after the lease terminated. Earlier removal had been a prudent gesture that in no way jeopardized Conoco's right to recover its expenses. In addition, Conoco could reasonably believe that it was exposed to potential liability, as owner of the wreck, for damages that the wreck might cause to other property. Alternatively, because Conoco was a third-party beneficiary of the insurance contract between Republic and Bonanza, Conoco had standing to proceed against Republic for enforcement of the policy provisions.[2]

Republic and Bonanza appeal the district court's judgment. They argue that the district court erred in holding that (1) Conoco's removal of the sunken Aqua Safari was compulsory by law; (2) Conoco could recover the cost of removal under the policy provision covering expenses Conoco became legally liable to pay "in connection with any fixed or movable object"; (3) Conoco was liable for removal of the Aqua Safari as owner of the vessel; and (4) neither Republic nor Bonanza was entitled to limit liability for the cost of removal to the value of the Aqua Safari. We examine each of these contentions in turn.

We consider first whether Conoco may recover the cost of removing the sunken Aqua Safari under either clause of the P & I policy. The first directs reimbursement of the assured for sums that, as owner, it has become legally liable to pay and has paid in connection with a fixed or movable object. The second indemnifies the assured for wreck removal expenses paid by it as owner when removal is compulsory by law. We consider these, in Parts II and III, in the reverse of the order in which they appear in the policy.

Apart from recovery under the P & I policy, the district court's judgment allows Conoco to recover the cost of removal from Bonanza, the owner of the vessel negligently sunk. Because we decide that Conoco may not recover removal costs under the policy, we address finally in Part IV Bonanza's assertion that the district court incorrectly denied limitation of its liability to Conoco.

## II. COMPULSORY BY LAW

### A. Policy Coverage for Wreck Removal

The P & I policy requires Republic to pay only when its assured "shall have

---

1. "The liability of the owner of any vessel ... for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, *without the privity or knowledge of such owner* or owners, shall not ... exceed the amount or value of the interest of such owner in such vessel ...." 46 U.S.C. § 183(a) (1976) (emphasis supplied).

2. We need not consider at this time Conoco's standing to compel Republic to make payments to Bonanza under the policy. Bonanza has as yet incurred no expenses with regard to the

removal of the Aqua Safari, and so has submitted no policy claims to Republic. Following our affirmance of the district court's judgment that Bonanza is liable to Conoco without limitation for the cost of the Aqua Safari's removal, 511 F.Supp. at 66, Bonanza may well seek indemnification from Republic. Any ruling now that, in the event Republic should demur, Conoco has standing to seek enforcement of the policy as a third-party beneficiary, would be premature.

become legally liable to pay and shall have paid ...." Thus the assured must prove a legal liability in order to recover. Bonanza did not pay for the removal of the wreck and has never made a claim under the policy. Conoco cannot, therefore, recover on the basis that removal was compulsory as to Bonanza. We turn to the claim that Conoco can recover because it was compelled to remove the wreck.[3]

The policy extends coverage only when removal is compulsory by law. Unlike the Second Circuit, we do not find this phrase to be a term of art. *See Seaboard Shipping Corp. v. Jocharanne Tugboat Corp.,* 461 F.2d 500, 504 (2d Cir.1972).[4] Instead its words are to be construed in their "plain, ordinary, and popular sense." *Boudreaux v. Fireman's Fund Ins. Co.,* 654 F.2d 447, 449 (5th Cir.1981); *Calcasieu Marine Nat'l Bank v. American Employers' Ins. Co.,* 533 F.2d 290, 295 (5th Cir.), *cert. denied,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976).

The Random House Dictionary (8th ed. 1981) defines "compulsory" in two different senses. One is "using compulsion; compelling; constraining." The other is "required without exception; mandatory; obligatory." The first sense betokens that compliance is impelled, perhaps by sanctions. The second more closely suggests an unavoidable mandate.[5] The policy does not unambiguously adopt either definition. We must consider not only what is "compulsory," but also what is meant by compulsion effected by "law." *Jocharanne* decided that, as a term of art, the phrase had the second meaning: removal is compulsory by law only when a governmental, or, perhaps, judicial body directs it. Restricting "compulsion" to the mandate of a governmental agency rather than according it the usual significance of the generalized command of a statute or judicial decision narrows the meaning of the term considerably and, we think, unjustifiably. A statute requiring a warning on cigarettes that smoking may be harmful to the smoker's health would appear to make the warning "compulsory by law" without the intervention of an administrative official. Compulsion is not exerted only by direct command. Conduct is compelled whenever there is a sanction for disobedience. The criminal law does not state, "You must leave bank money in bank tills." Instead, it makes bank robbery a crime and imposes penalties on those convicted, thus engendering compulsion not to steal. We are, therefore, unable to restrict the meaning of "compulsory" to acts performed in response to order.

Practical considerations also indicate that removal should not be considered compulsory by law only after specific mandate has issued. If removal were compulsory by law only after competent governmental authority had given its edict, then the vessel owner who removed a vessel he had negligently sunk could not recover the costs of removal even after other vessels had run aground on the wreck until some governmental agency gave the peremptory command. The owner (and consequently its insurer) would be exposed to repeated damage claims without being able to rely on policy coverage to eliminate the hazard, unless a governmental agency ordered removal. Even removal to

---

**3.** Conoco argues that Republic has somehow waived its rights under the policy to make payments only to Bonanza because at times Republic has made payments under identically written policies directly to injured seamen, rather than to its assureds. The district court did not address this theory. A Republic executive testified that this is by no means done invariably, but as an accommodation to favored customers. We do not believe that Republic's practice of directly reimbursing injured seamen pursuant to other P & I policies dictates its obligation to reimburse Conoco for wreck removal expenses under this policy.

**4.** The vessel in *Jocharanne* was removed as part of "sue and labor" activities. Because the vessel owner had the vessel removed to salvage the hull, the "compulsory removal" provision of the insurance policy never came into play.

**5.** The same distinction is drawn by the definitions of Webster's Third New International Dictionary (14th ed. 1961). The first definition offered is "demanded, directed, or designated by authority: ENFORCED, MANDATORY." The second is "having the power of compulsion: COERCIVE, COMPELLING."

avoid criminal sanctions [6] would not be covered.

Thus, the clause should be so construed that removal does not become compulsory by law only when a court has rendered judgment requiring it or when an official has issued a fiat. This does not mean that any removal undertaken to minimize possible exposure to legal liability is covered. There must be a compulsion, a legal duty. To be compelling, the duty must be clear and the sanctions for its violation both established and sufficiently severe to be impelling, that is to warrant the cost of removal. But removal occasioned by a reasonable apprehension of slight consequences for inaction or by an unreasonable apprehension even of grave consequences is not compelled.

In determining whether removal is legally compelled, we look to the state of affairs as they would appear to a reasonable owner under the circumstances. This is the traditional objective test applied to determine the legal propriety of conduct. It does not look to the bona fides or the state of mind of the owner, an area as difficult to explore as any terra incognita and one whose real condition may readily be masked or feigned. *Cf.* 2 F. Harper & F. James, The Law of Torts § 16.2 (1956) (on the whole, torts law evaluates defendant's actions by objective standard of conduct, in part because of "practical impossibility of administering any standard which would call for measuring the infinite and imponderable differences among men"); W. Prosser, Handbook of the Law of Torts § 32 (4th ed. 1971) ("The standard of conduct which the community demands must be an external and objective one, rather than the individual judgment, good or bad, of the particular actor . . . ."). The test is similar to the inquiry now required to support a government official's good faith immunity defense. *Harlow v. Fitzgerald,* —— U.S. ——, ——, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396, 410 (1982) (abandoning subjective element of good faith test and announcing standard that "conduct [must] not violate clearly established statutory or con-

---

**6.** 33 U.S.C. § 411 (1976) provides criminal penalties for the owner of a sunken vessel who violates 33 U.S.C. § 409 (1976), which makes unlawful voluntary or careless sinking of vessels in navigable channels, and requires their removal. The statutes read in relevant part:

> It shall not be lawful ... to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels .... And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidently or otherwise, ... it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as hereinafter provided for.

33 U.S.C. § 409 (1976).

> Every person and every corporation that shall violate, or that shall knowingly aid, abet, authorize, or instigate a violation of the provisions of sections thirteen, fourteen, and fifteen of this Act [33 USC §§ 407, 408, 409] shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) for not less than thirty days nor more than one year, or by both such fine and imprisonment, in the discretion of the court, one-half of said fine to be paid to the person

> or persons giving information which shall lead to conviction.

33 U.S.C. § 411 (1976).

This circuit has also interpreted 33 U.S.C. § 403 (1976) to prohibit the obstruction of navigable waters by sunken vessels, *United States v. Cargill, Inc.,* 367 F.2d 971, 975 (5th Cir.1966), *aff'd on other grounds sub. nom. Wyandotte Transp. Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), and thus the criminal penalties set out in 33 U.S.C. § 406 (1976) for violation of § 403 may be invoked in this circuit for failure to remove a sunken vessel. 33 U.S.C. §§ 403 and 406 read in relevant part:

> The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited ....

33 U.S.C. § 403 (1976).

> Every person and every corporation that shall violate any of the provisions of sections nine, ten, and eleven of this Act [33 USC §§ 401, 403, and 404] ... shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) not exceeding one year, or by both such punishments, in the discretion of the court.

33 U.S.C. § 406 (1976).

stitutional rights of which a reasonable person would have known . . . . ").

Thus we adopt the test applied by a panel of this court in *Progress Marine, Inc. v. Foremost Insurance Company,* 642 F.2d 816 (5th Cir.1981), *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1982), but we eliminate the second inquiry, "whether removal was performed as a result of a subjective belief on the part of the insured that such was reasonably necessary . . . ." *Progress Marine,* 642 F.2d at 820. We focus on what the reasonable assured would have done, not on the thought processes of the actual assured or his counsel on a given day.

### B. Conoco's Duty as Lessee

■ Conoco's lease agreement [7] and former federal regulations [8] required Conoco within one year after its lease terminates to remove all equipment from the leasehold except property permitted to remain by the United States as lessor. The district court determined that, because of the terms of the lease and regulations, "earlier removal by CONOCO was prudent in order to mitigate damages and losses and to enable CONOCO to continue drilling and producing the lease." *Continental Oil v. Bonanza Corp.,* 511 F.Supp. 62, 65 (S.D.Tex.1980). We find that the policy does not insure against removal required of an insured unless the duty is occasioned by its ownership of the vessel and that, in addition, neither the lease nor the regulations impose the legal compulsion contemplated by the policy.

The district court's conclusion that Republic's indemnity policy covers obligations Conoco owes as a federal lessee fails suffi-

ciently to consider the explicit policy language. Coverage is limited to sums Conoco pays "as owner" of the Aqua Safari. The constrictive effect of this language is well recognized. *St. Paul Fire & Marine Ins. v. Vest Transp.,* 666 F.2d 932, 945 (5th Cir. 1982); *Wedlock v. Gulf Miss. Marine,* 554 F.2d 240, 244 (5th Cir.1977); *Lanasse v. Travelers Ins.,* 450 F.2d 580, 584 (5th Cir. 1971), *cert. denied,* 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 120 (1972). The policy's protection does not embrace Conoco's obligations as a lessee.

Even if the policy extended coverage to a lessee's obligations, however, it would not indemnify against the expense of removal in Conoco's situation. The regulations imposed no present duty to remove the wreck, as the district court recognized, but only the duty to remove property "upon termination" of the lease, an event that would not occur until Conoco either violated the lease or mineral production ceased. There was uncontroverted testimony that production from existing wells was likely to continue for at least eight to ten years and that the lease could be renewed thereafter for as long as the leasehold continued producing oil or gas or as long as drilling continued. Thus, Conoco's duty would not arise for many years. In any event, Conoco was not unconditionally bound even then to remove the wreck. The regulations exempted from removal "property permitted by the lessor to be maintained." It was possible that the United States as lessor might, at termination of the lease, permit the wreck to remain for, half-covered two years after the wreck, she might in another decade have been fully blanketed.[9] The district court

---

**7.** Section 9 of the lease agreement with the United States provides in pertinent part: "Upon termination of this lease[,] . . . Lessee shall within a period of one year thereafter remove from the premises . . . all structures, machinery, equipment, tools, and materials *in accordance with applicable regulations* and orders of the Supervisor . . . ." (Emphasis added.)

**8.** The regulations in force at the time the lease was executed and at the time of the sinking and removal of the Aqua Safari provide: "Upon the expiration of any lease, or the earlier termina-

tion thereof as provided in the regulations in this part, the lessee shall within a period of one year thereafter remove from the premises all structures, machinery, equipment, tools and materials other than improvements needed for producing wells or for drilling or producing other leases, and other property permitted by the lessor to be maintained." 43 C.F.R. § 3307.3–6 (1978). The regulations have since been changed.

**9.** Indeed, it is not clear that Conoco would have been obliged to remove the Aqua Safari had the government insisted. Conoco's lease and the

found that considerations of prudence and convenience warranted earlier removal. Republic did not undertake, however, to pay the costs of Conoco's exercise of good judgment, but only those paid as owner when removal was compulsory by law.

### C. Conoco's Duty as Owner

■ Conoco was never the owner or even the bareboat charterer of the Aqua Safari. Under the time charter, the vessel was but a maritime taxi, manned, victualled, supplied, and navigated by Bonanza to run Conoco's errands. *Compare* 46 U.S.C. § 186 (1976) (charterer deemed owner for purposes of limitation if it mans, victuals, and navigates the vessel). The district court reasoned that, "as an additional assured, CONOCO has the same rights as any other assured under the policy," 511 F.Supp. at 65, and could, therefore, recover the cost of removing the Aqua Safari. The premise does not support the conclusion. The policy does not cover all of the expenses incurred by anyone named as an assured, but affords protection only for the risks enumerated. Neither assured, Conoco or Bonanza, may recover the cost of removal unless it was obliged to remove the wreck because of its status as owner of the vessel. Conoco's status as a time charterer, alone or in combination with its leasehold interest in the property on which the Aqua Safari sank, did not amount to an ownership interest imposing on Conoco the legal duty to remove the sunken wreck. G. Gilmore & C. Black, The Law of Admiralty § 4–23 (2d ed. 1975).

■ Even if Conoco's interest constituted ownership for purposes of this policy provision, Conoco would not have been liable *as owner* to remove the wreck because the sinking of the Aqua Safari was not attributable to Conoco's negligence. A non-

negligent owner is not personally liable for the cost of removing a sunken vessel, even if the vessel constitutes a hazard to navigation. *St. Paul Fire & Marine Ins.,* 666 F.2d at 940; *Tennessee Sand and Gravel v. M/V DELTA,* 598 F.2d 930, 934 (5th Cir.1979), *modified on other grounds,* 604 F.2d 13 (5th Cir.1979) (per curiam). Nor could Conoco be held vicariously liable for Bonanza's negligence. A time charterer who does not control the operation or navigation of the chartered vessel is not responsible for the consequences of the vessel owner's negligence. *Agrico Chemical v. M/V BEN W. MARTIN,* 664 F.2d 85, 91 (5th Cir.1981).

Nothing in the circumstances of this case justifies shifting the duty of removal from Bonanza, the shipowner whose negligence caused the sinking, or extending that duty to Conoco. That both Bonanza and Conoco were named as assureds does not justify treating them as a composite entity in which each assumed the qualities of the other. Conoco's recovery under the policy extends only to the reimbursement due it for sums for which it became liable in the capacity designated by the policy.

### D. Exposure to Liability

■ The test we have adopted, like the one formulated in *Progress Marine,* makes removal compulsory when a reasonable owner, fully informed, would conclude that failure to remove would likely expose him to liability imposed by law sufficiently great in amount and probability of occurrence to justify the expense of removal. The compulsion of law is not restricted to a categorical duty, attended by criminal sanctions. It extends to a legal duty imposed either by statute or general maritime law, including those duties for whose non-performance the sanction is payment of damages to persons injured. Even thus inter-

existing regulations required removal of "structures, machinery, equipment, tools, and materials." This language does not obviously encompass submerged vessels. Conoco did not own or operate the Aqua Safari, and Conoco has cited no authority that the obligation to remove equipment from a leasehold extends to property owned by third parties that finds its way to the Gulf's bed. The federal lease and regula-

tions could reasonably be construed as obligating Conoco to remove only material it intentionally placed on the leasehold, rather than requiring Conoco to clear the seabed. At any rate, Conoco made no effort even to ascertain whether removal would be required. It had at least a duty to do that in order to minimize its expense before seeking to tax the insurer.

preted, the policy nonetheless extends only to a duty to remove "imposed by law."[10] *Id.* Such a duty must be present and unconditional, not remote and contingent. The possibility that, by an extension of maritime law not yet decreed, Conoco might be held liable in the future should the Aqua Safari be dislodged from the mud and propelled against other structures, is not such a legal obligation.

■ No decision or statute has been cited to us imposing on Conoco liability to third parties in the event of such an occurrence. The district court found no such predicate. Conoco relied only on the apprehension that it might become liable on some as yet unformulated basis should the Aqua Safari damage other property. It now conjectures that the legal buck might have come to rest on it in various ways: vicarious liability for Bonanza's negligence; some thesis that it was independently negligent for allowing the wreck to remain on its leasehold; that it allowed a nuisance to continue unabated; or the possibility that it might be held not to have exercised reasonable care in choosing Bonanza for its chartering mission. Those are interesting exercises in legal imagination, but they do not define what is compulsory by law. In the absence of an established legal obligation to third parties, Conoco was not reasonably exposed to liability justifying the expense of removal.

Not only was there no settled principle of law on which a potential claimant might ground Conoco's liability, but the factual circumstances on which such an assertion of liability would rest were only remote possibilities. The wreck lay directly beneath the rig, half-covered with mud, and apparently still sinking. It was approximately 2000 feet from the nearest property owned by third parties. The probability was slight that it could be uprooted and carried across the leasehold by strong currents, and even slighter that any object navigating on the surface would be disturbed by the wreck thirty-four feet below, directly beneath the drilling rig. There was not a hint of evidence that Conoco failed to exercise due care in selecting Bonanza.

Usually a finding that a belief is reasonable would be a finding of fact, reversible only if clearly erroneous. Fed.R.Civ.P. 52(a). Resting as it does on the misinterpretation of policy coverage, however, the finding that Conoco had a reasonable apprehension of liability is not supported by the Rule 52(a) imprimatur.[11] Conoco could not reasonably have believed that it faced potential liability sufficiently great to justify the expense of removing the sunken Aqua Safari. *See Progress Marine,* 642 F.2d at 820 ("[R]emoval occasioned by an ... unreasonable apprehension of criminal or civil liability c[an] not be considered 'compelled by law.' ")

---

10. *Compare St. Paul Fire & Marine Ins. v. Vest Transp.,* 666 F.2d 932, 945 (5th Cir.1982) (per curiam) (by judicial decisions, owner of sunken barge not liable to U.S. government for removal costs when sinking caused by negligence of towing vessel and, therefore, policy indemnifying owner for removal that is compulsory by law did not provide coverage to owner); *M.J. Rudolph Corp. v. Lumber Mut. Fire Ins.,* 371 F.Supp. 1325, 1327 (E.D.N.Y.1974) (removal compulsory by law when owner served with court summons charging obstruction of waterfront property pursuant to harbor regulation prohibiting obstruction of waterfront property by sunken vessel).

11. Were subjective inquiry pertinent, the district court's findings do not support the conclusion that Conoco's decision was based on its fear of liability to third parties. The district court found that Conoco first demanded removal of the wreck "[b]ecause of possible dangers in moving the drilling rig." 511 F.Supp. at 64. Conoco later moved the sunken vessel, the district court found, because "[t]he presence of the AQUA SAFARI constituted a continuing hazard to the placement of the fixed structure ... [and] so that the wreck would not cause danger to any other [Conoco] structures or pipelines in the area." *Id.* Indeed, Conoco's house counsel in a telegram to Bonanza demanding removal of the wreck, stated as reasons:

> While we are concerned about the safe removal of Transworld's Rig 64, even if that were accomplished the problem is not solved. The continued presence of the M/V AQUA SAFARI would prevent us from setting a production platform on the location where we have drilled our initial wells.

## III. OWNER'S LEGAL LIABILITY IN CONNECTION WITH FIXED OR MOVABLE OBJECT

 Our conclusion that Conoco had no legal obligation as owner to remove the Aqua Safari disposes of Conoco's alternate contention that it is entitled to recover its expenses under the policy provision covering indemnity of sums that *"as owner [Conoco] ... shall have become legally liable to pay and shall have paid on account of* [l]oss of, or damage to, or expense in connection with any fixed or movable object ...."* (emphasis supplied). A nonnegligent owner, let alone charterer,[12] has never been held liable to third parties, who ran onto a sunken wreck on the basis that he had a duty to remove the wreck,[13] and no third party had even expressed fear that the Aqua Safari posed a danger.

The legal-liability clause, of course, provides coverage different from that afforded by the compulsory-removal clause. The wreck-removal clause indemnifies the assured for taking measures (*i.e.* removal) that not only comply with law but that are also preventive, avoiding future liability for wrecks. The legal-liability clause indemnifies for sums paid in consequence of damage to and expense incurred in connection with property, contemplating reparative measures. It does not accord protection for steps taken to avert liability. The clause "expense in connection with ... property" cannot be wrested from context to provide separate coverage for any expense the assured might undertake to incur so long as it is in connection with property. The insuring provision covers only "such sums as the assured, as owner ... shall have become legally liable to pay and shall have paid on account of ... expense in connection with ... property ...."

Conoco argues, nonetheless, that it was concerned about the possibility of third-party claims. The mere possibility of future liability does not trigger coverage. The policy does not provide a self-energizing doctrine by which coverage extends not only to the risks stated but to those feared by the assured. Republic did not underwrite the legal opinions of Conoco's house counsel. It has no obligation to indemnify Conoco for the cost of preventive measures that house counsel deemed prudent.

Judge Williams's dissent rests in part on the thesis that, when Bonanza sought to abandon the Aqua Safari, the "derelict vessel ... was then still time chartered to" Conoco. The time charter probably terminated when the vessel sank.[14] Even if it

12. *Agrico Chemical v. M/V BEN W. MARTIN,* 664 F.2d 85, 91 (5th Cir.1981). In *Winter v. Eon Production, Ltd.,* 433 F.Supp. 742 (E.D.La. 1976), a vessel owner was held not liable for negligent acts of anyone but his servants. *A fortiori* a time charterer would not incur liability for the acts of the master who was not his employee.

13. A panel of this court recently held in *Nunley v. M/V Dauntless Colocotronis,* 696 F.2d 1141 (5th Cir.1983), *vacated and reh'g en banc granted,* that failure of the United States and of the nonnegligent owners of a sunken vessel to mark or remove it does not, as a matter of law, relieve the negligent sinker of liability for damages resulting from a third party's subsequent collision with the wreck. For purposes of the appeal, the *Nunley* court assumed that the nonnegligent owners would be held liable for damages because of their failure to mark or remove the vessel. The court conceded that, if the owners were free of fault in failing to mark or remove, they would not be liable, 696 F.2d at 1143 n. 3, but the opinion did not elaborate on this issue because the interlocutory appeal preceded trial on the merits.

14. The charter party did not provide for termination in the event of a sinking, but this would be consonant with the traditional application of the doctrines of frustration and impossibility to charter parties. G. Gilmore & C. Black, The Law of Admiralty § 4–12 (1975). For example, the destruction of the vessel before the charter begins cancels the charter. *Texas Co. v. Hogarth Shipping Co.,* 256 U.S. 619, 41 S.Ct. 612, 65 L.Ed. 1123 (1921); 2B A. Sann & B. Chase, Benedict on Admiralty 9 (1982). *See also Asphalt International, Inc. v. Enterprise Shipping Corp.,* 667 F.2d 261, 265–66 (2d Cir.1981) (commercial law principle of impracticability applied to owner's duty under charter party to repair sunken wreck and to resume charter obligations, with result that owner excused from performance). *Compare Jones v. Fuller-Garvey Corp.,* 386 P.2d 838 (Alaska 1963) (recognizing exception to common law rule that tenant remains obligated to pay rent notwithstanding destruction of leased premises

did not, the charter expired by its terms on January 27, 1977, for the charter party, entered into on December 28, 1976, was only for renewable thirty-day periods. The vessel sank on January 1, 1977, and Bonanza gave Conoco notice of abandonment on January 13, 1977. When Conoco moved the hull in mid-March, 1977, its charter had certainly ended.

## IV. LIMITATION OF BONANZA'S LIABILITY

Bonanza, now a dormant corporation, was, in 1976 and 1977, primarily engaged in land development. Headquartered in Conroe, Texas, it maintained marketing offices in Houston and field offices in the Houston area where its land development projects were located. At its most active stage, between 1970 and 1975, Bonanza had about eight corporate officers and about 30 payroll employees.

The Aqua Safari played a minor role in Bonanza's operations. Bonanza acquired the vessel at a U.S. Marshal's sale in 1973 and refurbished it to make it suitable for entertaining corporate customers and employees. At the time Bonanza purchased the Aqua Safari, the corporation already owned a deck boat, a houseboat, a 36-foot vessel, and several small boats that were used for corporate entertainment. Because Bonanza planned to make limited use of the Aqua Safari, the vessel was also fitted out for scuba diving. The Aqua Safari's first captain, Louis Schaeffer, arranged charters to scuba diving groups and, as a standby or service vessel, to other companies. Two corporate employees, Don Apostolo and Carl Bridges, Jr., had supervisory authority over the Aqua Safari's operations, and Jim Fuller, Bonanza's president and sole shareholder, had ultimate control over the vessel.

In 1976, Schaeffer left Bonanza's service, and Fuller hired Gary Freeman, who had previously worked on the vessel, as its cap-

tain. Freeman, Fuller thought, would be able to attract charters through business contacts. The Aqua Safari's charters were not adequate to support the vessel, and Fuller became disillusioned with his purchase. At one point, he leased the vessel to Freeman and drew up a contract with him for the sale of the Aqua Safari to a corporation Freeman had organized. These arrangements ended, however, when Freeman could not raise enough money to follow through on the leasing and purchase agreements. Freeman resumed his role as a nonsalaried employee of the corporation, and Bonanza continued to absorb the Aqua Safari's losses. Fuller had no day-to-day interest, however, in the Aqua Safari's affairs.

Freeman was authorized to seek out and negotiate charters independently. He had "carte blanche" to carry out scuba diving charters. For other charters, he had to get approval from Fuller, Apostolo, or Bridges. Although Bonanza's bank required Fuller to authorize payment of the Aqua Safari's maintenance and repair bills, and Freeman sought Fuller's approval beforehand as a matter of course, Fuller had no maritime expertise, so Freeman decided what purchases and repairs would be made and when they would be made. He orchestrated a major overhaul of the Aqua Safari just before Conoco chartered the vessel. Freeman also hired the Aqua Safari's crew on a per-trip basis, without consulting Fuller, to meet the needs of each occasion.

In determining the scope of the protection afforded by limitation of liability, we must consider the social and economic purpose that this exculpatory device serves. We have noted that the impetus behind passage of the Limitation of Liability Act of 1851, 46 U.S.C. § 183 *et seq.* (1976), was "to ensure that American shipping attracted investment capital that the threat of unlimited exposure might divert to England," which already provided for limited

---

when purpose of lease totally frustrated by event not contemplated in lease); Restatement (Second) of Property: Landlord and Tenant §§ 5.2 & 5.4 (1977) (change in condition of leased property, without fault of tenant, which makes property unsuitable for use contemplated by parties, constitutes breach of landlord's obligation and permits tenant to terminate lease).

liability. *University of Texas Medical Branch at Galveston v. United States,* 557 F.2d 438, 441 (5th Cir.1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978). *See* 23 Cong.Globe, 31st Cong., 2d Sess. 714 (Remarks of Sen. Davis, Feb. 26, 1851); *id.* at 715 (Remarks of Sen. Hamling, Feb. 26, 1851). Observing that the Act was passed "in an era before the corporation, with its limited shareholder liability, had become the standard form of business organization and before the present range of insurance protection was available," 557 F.2d at 454, we have called the Act now "hopelessly anachronistic." *Id.* at 441. In 1975, Professors Gilmore and Black likewise traced a "discernible judicial trend to narrow the Limitation Act by construction." G. Gilmore & C. Black, The Law of Admiralty 878 (2d ed. 1975). This does not empower us to disregard the statute for Congress, by failing to repeal it, has indicated that it must still be applied. It does, however, affect whether interpretation should be expansive or constricted.

■ A corporation is prevented from limiting its liability by the act of a managing agent when "the negligence is that of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred ...." *Coryell v. Phipps (The Seminole),* 317 U.S. 406, 410–411, 63 S.Ct. 291, 293, 87 L.Ed. 363, 367 (1943). The district court held that Bonanza was not entitled to limit its liability to Conoco for the cost of the Aqua Safari's removal because Freeman was a managing agent of Bonanza with respect to the vessel's operations. His negligence had, therefore, been with Bonanza's privity or known to it.

The district court's finding that Freeman was a managing agent of Bonanza is not clearly erroneous. Fed.R.Civ.P. 52(a); *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). Freeman was responsible for maintaining the Aqua Safari in seaworthy condition, hiring its crew, and arranging its charters, subject to the approval of his superiors. Bonanza was

principally engaged in land-based operations, such as land development. Freeman was in virtual full charge of Bonanza's maritime venture, the operation of the Aqua Safari. In addition, Bonanza paid Freeman a portion of the Aqua Safari's profits, not a fixed salary. The extent of Freeman's duties and the minimal supervision he received from the corporate officers suffice to support the finding that he was its managing agent. As stated in *The Erie Lighter 108,* 250 F. 490, 494 (D.N.J.1918), "a 'managing officer' is ... anyone to whom the corporation has committed the general management or general superintendence of the whole or a particular part of its business ...."

■ The relevant question, though, is not simply, "Was Freeman a managing agent?" The navigational negligence of a master who also occupies a managerial position in a corporation does not of itself deprive the corporation of the right to petition for limited liability. *The Marie Palmer,* 202 F. 1023 (5th Cir.1913), *aff'g* 191 F. 79 (E.D.Ga.1911). The master's mistake is not the fault of the shipowner "simply because the master has been given broad and unlimited agency powers over the operation and maintenance of the vessel." *Admiral Towing v. Woolen (The Tug Companion),* 290 F.2d 641, 648 (9th Cir.1961). It must be established that Freeman was a managing agent with respect to the field of operations in which the negligence occurred. The evidence suffices to support the district court's implicit conclusion that he was.

■ Because a corporation operates through individuals, the privity and knowledge of individuals at a certain level of responsibility must be deemed the privity and knowledge of the organization, "else it could always limit its liability." *Coryell v. Phipps (The Seminole),* 317 U.S. 406, 410–11, 63 S.Ct. 291, 293, 87 L.Ed.2d 363, 367 (1943). Where the level of responsibility begins must be discerned from the circumstances of each case.

■ Freeman was more than master, and he had greater responsibility than oper-

ation and maintenance of the vessel.[15] Although Freeman was neither a shareholder nor an officer of the close corporation,[16] Fuller granted him so much autonomy in the management of the vessel that the district court was not in error in attributing Freeman's privity and knowledge to the corporation. *See Avera v. Florida Towing Corp.*, 322 F.2d 155, 163 (5th Cir.1963) (acknowledging persuasiveness of theory that "the scope of authority delegated by an owner to a subordinate servant may be so broad as to justify imputing privity as well as knowledge"); *Silver Line, Ltd. v. United States (The Silverpalm)*, 94 F.2d 776, 780 (9th Cir.1937) (shipowner may not escape liability by giving managerial functions to employed person acting as his agent); *In re Great Lakes Transit Corp.*, 81 F.2d 441, 444 (6th Cir.1936) (privity and knowledge may be imputed to owner if someone in charge had general authority to act for owner); *In re New York Dock Co.*, 61 F.2d 777, 779 (2d Cir.1932) (scope of authority delegated to general superintendent so broad that his privity and knowledge was in law that of owner); *The Trillora II (Petition of Guggenheim)*, 76 F.Supp. 50, 52 (E.D.S.C.1947) (when owner delegates full authority to agent, he is bound by acts of agent and will

be held in privity by knowledge of agent). The corporate authority delegated to Freeman with respect to the Aqua Safari's operations was so complete that Freeman's privity and knowledge was that of the corporation, and his negligence precludes limitation.

## V. CONCLUSION

Removal of a wreck is not compulsory by law unless there is a clear legal obligation to remove, imposed by statute or by judicial decision, on the party who effects removal. Conoco having failed either to demonstrate such an obligation here, or to show that governmental authorities had directed removal of the Aqua Safari, we hold that its removal of the Aqua Safari was not covered by the P & I policy. Because Conoco was not legally liable to take any action with regard to the Aqua Safari, it is not entitled to indemnity for the cost of removal under the policy provision covering expenses an owner becomes legally liable to pay in connection with a fixed or movable object.

Freeman's near-exclusive control over the Aqua Safari differentiates him from those masters whose negligence at sea tradition-

---

**15.** As noted in 3 A. Sann, K. Halajian, N. Golden, B. Chase, J. Levine, & R. Grieder, Benedict on Admiralty § 42 (7th ed. 1982), no court has previously denied a corporate shipowner limitation of liability for a master's navigational errors at sea when the owner has exercised reasonable care in selecting the master. The theory supporting limitation when the master commits navigational errors is two-fold. First, when the owner exercises due care in selecting the master, he discharges his obligations and he may thereafter rely on the master's skill and expertise. Second, when the owner is so far removed from the vessel that he can exert no control over the master's actions, he should not be taxed with the master's negligence. G. Gilmore & C. Black, The Law of Admiralty 877 (2d ed. 1975).

**16.** Whether a corporation has "privity or knowledge" of a negligent act may be determined on the basis of whether the negligent employee is sufficiently high in the corporate hierarchy to make his awareness that of the corporation. *E.g., Spencer Kellogg & Sons v. Hicks (The Linseed King)*, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932); *Kinsman Transit Co. Petition (The Shiras)*, 338 F.2d 708 (2d

Cir.1964), *cert. denied,* 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965). When the negligent employee has no formal place in the corporate ranks, however, his "privity and knowledge" may still be attributed to the corporation. *E.g., China Union Lines, Ltd. v. A.O. Andersen & Co. (The Reliance)*, 364 F.2d 769, 787 (5th Cir.1966), *cert. denied,* 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967) (supervisory shore personnel); *Coleman v. Jahncke Service, Inc. (The Claribel)*, 341 F.2d 956, 960 (5th Cir.1965), *cert. denied,* 382 U.S. 967, 86 S.Ct. 525, 15 L.Ed.2d 463 (1966) and 382 U.S. 974, 86 S.Ct. 538, 15 L.Ed.2d 465 (1966) (marine superintendent). *See also* cases cited in 3 A. Sann, K. Halajian, N. Golden, B. Chase, J. Levine & R. Grieder, Benedict on Admiralty § 42 n. 2 (7th ed.1982) (knowledge of managers, superintendents, agents, and ship officers, as well as corporate officers, may be attributed to corporation). The extent of the employee's responsibility, not his title, determines whether limitation is foreclosed. *Coleman v. Jahncke Services, Inc.*, 341 F.2d at 958 (privity or knowledge of those to whom authority of management has been delegated binds the corporation).

ally has not deprived shipowners of the right to limited liability. His actions bearing the stamp of corporate authority, Bonanza may not limit its liability for the result of his navigational errors. Bonanza is liable to Conoco without limitation for the expenses Conoco incurred in moving the sunken Aqua Safari.

For these reasons, the judgment of the district court granting Conoco the right to recover the cost of the Aqua Safari's removal under the P & I policy issued by Republic is REVERSED. The district court's judgment denying Bonanza the right to petition for limitation of liability is AFFIRMED.

JERRE S. WILLIAMS, Circuit Judge, with whom JOHN R. BROWN, POLITZ, TATE and JOHNSON, Circuit Judges, join, dissenting:

We disagree with the majority of the Court as to the liability of the Republic Insurance Company for Conoco's expenses in raising the sunken vessel AQUA SAFARI. Our disagreement lies in the interpretation and application of Conoco's insurance policy with Republic. To find the insurance company responsible to Conoco, we must find that within the terms of the policy Conoco was an "owner" of the vessel and that raising the vessel was "compulsory by law". It is our position that Conoco meets these requirements of the insurance policy and should be indemnified under the policy as to its expenses in raising the sunken vessel. While the proper interpretation of these words in the policy is our only disagreement with the majority, it is critical to the holding in this case.

We place our reliance in large measure upon the case of *Progress Marine, Inc.. v. Foremost Insurance Co.*, 642 F.2d 816 (5th Cir.1981), *cert. denied*, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981). While purporting to follow our decision in *Progress Marine*, the majority of the Court substantially alters the "compelled by law" test carefully constructed in that case. In turn, the application of the modified test leads, in our view, to an erroneous decision.

The test, as stated in *Progress Marine*, is as follows:

[R]emoval occasioned by an unarticulated or unreasonable apprehension of criminal or civil liability could not be considered "compelled by law." On the other hand, where removal was reasonably required by law, or where failure to remove would have reasonably exposed an insured to liability imposed by law sufficiently great to justify the expense of removal, then, we believe, that such removal could be considered "compelled by law" for purposes of recovery. However, an additional inquiry must be made as to whether the removal was in fact "compelled by law," that is, whether removal was performed as the result of a subjective belief on the part of the insured that such was reasonably necessary to avoid legal consequences of the type contemplated by this policy.

642 F.2d at 820 (footnote omitted).

The opinion for the Court alters this test in two ways. A minor way, which is not of significant importance in this case, is to eliminate the subjective test as to the actual motive of the insured in the removal of the vessel. We are not disposed to disagree with the elimination of this subjective element since the critical test lies in an objective evaluation of exposure to possible liability because of failure to remove.

The other change in the test is sweeping and is the source of our disagreement. The opinion of the Court changes the crafted and balanced test of *Progress Marine* to a much more stringent interpretation of the phrase "compelled by law" to require the specific showing of "a legal duty imposed either by statute or general maritime law, including those duties for whose non-performance the sanction is payment of damages to persons injured. Even thus interpreted the policy nonetheless extends only to a duty to remove [the sunken vessel] 'imposed by law'. Such a duty must be present and unconditional, not remote and contingent."

The fallacy of such a narrowly restrictive test, now setting up the requirement that

legal duty be present and unconditional, is demonstrated by envisioning a not unlikely scenario based upon the facts of this case. A hurricane sweeps the area of the Gulf where the drilling rig and the sunken AQUA SAFARI are located. The roiled waters force the sunken vessel (only thirty-five feet below the surface) against a pipeline not owned by Conoco approximately a half mile away. The pipeline is ruptured. Because of the storm, there is a period of some hours before the flow of oil can be stanched. There is a loss of a huge quantity of oil, there is substantial damage caused by the oil itself to other property in the vicinity, to marine life, and ultimately to beaches on the shore.

The opinion of the Court tells us that in spite of the huge amounts of damages occasioned to a number of different legal entities, the highly skilled legal counsel of all of those legal entities will give the clear and firm advice that Conoco cannot be found liable in any way for allowing that sunken vessel to remain on its lease, and there is no need to bother to sue Conoco under any theory of the law. The realistic picture, we are certain, differs greatly. The highly skilled and highly paid legal profession will develop plausible legal analyses under which Conoco may be held liable for allowing that sunken vessel to remain on its lease. Bonanza is no longer an active corporation, and Conoco is the only source of recovery for the damages. Conoco will almost surely be sued.

Carrying the scenario one step further, some of the skilled lawyers do convince their clients that Conoco can be held liable for failure to remove the vessel, and suit is brought. The opinion for the Court assures us that no judicial decision can possibly be rendered which would hold Conoco liable under these circumstances. In the analysis of the majority of the Court, Conoco has no more connection with the AQUA SAFARI and the damage it causes than it would have had if the hurricane agitated waters had uncovered a sunken Spanish galleon on Conoco's lease and had impelled it against the pipeline.

In contrast to the certainty exuded by the opinion of the Court, this scenario, which might well have happened, realistically makes reasonable the possibility that Conoco would be held liable for not having removed this vessel which it had time chartered and which it had caused to be brought to the location where it was sunk as a result of the negligence of Conoco's hired contractor, Bonanza. Under the *Progress Marine* test, the removal of the vessel by Conoco was "compelled by law": "[R]emoval was reasonably required by law, or . . . failure to remove would have reasonably exposed an insured to liability imposed by law sufficiently great to justify the expense of removal." 642 F.2d at 820.

The magnitude of potential damages is an important aspect of this case. In *Progress Marine,* as well, we emphasized this consideration. There a barge went to the bottom because of the negligence of the owners. Pipelines were nearby. Hurricane season was drawing near. As the opinion of the Court said: "Potential exposure to (Progress Marine) resulting from its wreck rupturing an oil pipeline . . . could have been enormous." 642 F.2d at 820; *Signal Oil & Gas Co. v. Barge W–701,* 654 F.2d 1164 (5th Cir.1981), *cert. denied,* 455 U.S. 944, 102 S.Ct. 1440, 71 L.Ed.2d 656 (1982). So also in this case as to Conoco, the potential damages from a pipeline rupture were in the millions of dollars. The insurance policy itself provided for coverage of one million dollars. The actual cost of removal was $109,000—exceedingly low on a relative basis. The overwhelming amount of potential damage with possible liability of Conoco when related to the far lesser expenditure of removing the vessel, in our view, clearly justifies the conclusion that removal was "compelled by law".

The majority of the Court correctly states that no case has been found in which the time charterer of a vessel under these general factual circumstances was held liable for damage. Nor has any case been found which clearly negatives liability for such damage. We do concede, however, that there is no settled principle of law that

would fix liability on Conoco if the AQUA SAFARI, propelled by roiled storm waters from its resting place on Conoco's lease, had severed a pipeline. It is true that Conoco's absence of negligence in the sinking of the AQUA SAFARI *may* exonerate Conoco for liability for damages the wreck may cause. We stated in *Tennessee Valley Sand & Gravel Co. v. M/V Delta,* 598 F.2d 930, 934 (5th Cir.1979), *modified per curiam on other grounds,* 604 F.2d 13 (5th Cir.1979), that "[i]f the non-negligent owner exercises his right to abandon [a wreck], he is liable neither for the cost of removal nor for the damages suffered by third parties as a result of the wreck." [1] Further, Conoco was a time charterer. When an owner remains in control of a vessel, the time charterer is not ordinarily liable for damages due to the owner's fault. *Agrico-Chemical Co. v. M/V Ben W. Martin,* 664 F.2d 85, 91 (5th Cir. 1981). It is also uncertain whether Conoco could be held vicariously liable for Bonanza's negligence. In the personal injury context, at least, a time charterer generally has no liability for injuries caused by the owner's negligence. *See Mallard v. Aluminum Co.,* 634 F.2d 236, 242 n. 5 (5th Cir.1981), *cert. denied,* 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981).

But these principles do not provide an unequivocal answer to the question of Conoco's liability. A number of facts support a possible potential liability under the scenario. Conoco contracted with Bonanza to employ the AQUA SAFARI's services in Conoco's oil exploration enterprise. The

AQUA SAFARI under Conoco's orders entered the area of Conoco's operations—an area crisscrossed with pipelines and studded with free-standing wells. When Bonanza disclaimed responsibility for the AQUA SAFARI's carcass and sought to abandon it, Conoco was left with a derelict vessel that was then still time chartered to it and lying on its lease. The vessel posed at least some threat to all structures in the vicinity. In the light of expanding concepts of enterprise and vicarious liability, Conoco faced a significant prospect of being held liable for damages should the AQUA SAFARI become a floating menace.

Even though Bonanza was an independent contractor, Conoco was not necessarily immune from liability. In Prosser's Law of Torts at 468 (4th Edition 1971), we find a prediction of development in the law:

[T]he prediction has been made that ultimately the "general rule" will be that the employer is liable for the negligence of an independent contractor, and that he will be excused only in a limited group of cases where he is not in a position to select a responsible contractor, or the risk of any harm to others from the enterprise is obviously slight. The English courts have taken steps in this direction, until the position of the ordinary independent contractor in England approaches that of a servant. The American courts have not gone so far, and have continued to repeat the "general rule" of non-liability with exceptions, whose very number is suffi-

---

1. Reference should be made to the well-established law of the Second Circuit which makes non-negligent owners of sunken vessels liable to third parties whose vessels collide with the wreck. These holdings are based upon the obligation of Section 15 of the WRECK Act, 33 U.S.C. § 409, which places the onus on the owner of the vessel (regardless of its negligence) or on the United States Government, to mark or remove a wreck which is a hazard to navigation. *See, e.g., Red Star Towing & Transportation Co. v. Woodburn,* 18 F.2d 77, 79 (2d Cir.1927).

Now pending en banc in this Court is *Nunley v. M/V Dauntless Colocotronis,* 696 F.2d 1141 (5th Cir.1983), *vacated and reh'g en banc granted,* which raises the question of whether the obligation to mark and/or remove a sunken

vessel under the WRECK Act on the part of the owner or United States Government relieves the third party which negligently caused the sinking three years previously from liability for a collision with the wreckage.

The *Nunley* case and other holdings under the WRECK Act, however, are not directly relevant to the case sub judice because the WRECK Act applies to wrecks which are a menace to "navigation". It cannot be shown that the sunken AQUA SAFARI is a menace to navigation. The most that can be said of a relevant principle to be extracted from this Act and these cases is that they show it is not unknown in the law for a non-negligent owner to be held liable for damage caused by a sunken vessel when the owner fails to carry out subsequent duties imposed by the law.

cient to cast doubt on the validity of the rule.

All that is needed to meet the test to establish Conoco's right to recover on its policy is a reasonable potential of liability. This statement warns of such a potential.

Finally, there are sound policy reasons to hold Conoco liable if it were to ignore the hazard posed by the AQUA SAFARI once Conoco knew the owner had abandoned the vessel. Conoco chose Bonanza's services and had ample opportunity to determine whether Bonanza was reliable. After Bonanza refused to remove the wreck, only Conoco was in a position to prevent a potential disaster. Conoco's failure to remove the vessel under these circumstances might be found to be in breach of a legal duty, independent of Conoco's freedom from negligence in the sinking of the vessel.

In spite of this potential, the opinion for the Court tells us that a lawyer asked by Conoco if it could ever be held liable in case the AQUA SAFARI ruptured a pipeline could only advise that there is no reasonable likelihood of any liability. In our view such advice would manifest overconfidence approaching rashness because of the potential for liability which existed while the AQUA SAFARI, having its admitted connection with Conoco, rested only thirty-five feet below the surface and near important pipeline installations in the hurricane-prone Gulf of Mexico. As we said in *Progress Marine*, "it at least cannot be said that no possibility for recovery . . . exists under the legal standard which we have announced." 642 F.2d at 820.

We turn now to the issue of whether Conoco was an "owner" of the vessel under the insurance policy. No persuasive contention is made by Republic with respect to this issue. Conoco was insured under the policy by clear implication as owner. It is true it was only a time charterer. But if the insurance companies knowingly insure and include such time charterers as "owners" under their policies, they should be held liable to time charterers as owners. Republic actually in its argument to this Court does not undertake to any serious extent to deny that Conoco was covered as "owner" under the policy. In its original brief to the panel it referred to the "owner or charterer" of the vessel being covered. Rather, the thrust of its argument is that if the vessel were dislodged and did damage, the liability would be to Conoco not as the "owner or charterer" of the vessel but as the lessee of the lease upon which the vessel rested.[2] Under its argument, Conoco would

---

2. The insurance policy throughout refers to the rights of "the assured". An endorsement makes Conoco an "assured", giving it the same stature under the policy as Bonanza.

Then the crucial provision of the policy which raises the "owner" issue reads:

In consideration of the premium and subject to the warranties, terms and conditions herein mentioned, this Company hereby undertakes to pay up to the amount hereby insured and in conformity with lines 5 and 6 hereof, such sums as the assured, as owner of the SD/Stand-By Vessel "Aqua Safari" shall have become legally liable to pay and shall have paid on account or:

Loss of life of, or injury to, or illness of, any person;

Hospital, medical, or other expenses necessarily and reasonably incurred in respect of loss of life of, injury to, or illness of any member of the crew of the vessel named herein;

Loss of, or damage to, or expense in connection with any fixed or movable object or property of whatever nature;

Costs or expenses of, or incidental to, the removal of the wreck of the vessel named herein when such removal is compulsory by law; provided, however, that there shall be deducted from such claim the value of any salvage recovered from the wreck by the assured;

Fines and penalties, including expenses reasonably incurred in attempting to obtain the remission or mitigation of same, for the violation of any of the laws of the United States, or of any state thereof, or of any foreign country; provided, however, that this Company shall not be liable to indemnify the assured against any such fines or penalties resulting directly or indirectly from the failure, neglect, or default of the assured or his managing officers or managing agents to exercise the highest degree of diligence to prevent a violation of any such laws;

Costs and expenses, incurred with this Company's approval, of investigating and/or defending any claim or suit against the assured arising out of a liability or an alleged liability of the assured covered by this policy.

be liable only if it were liable also for a sunken Spanish galleon which was on its lease and was dislodged and forced against a pipeline and caused a rupture.

Conoco was not a stranger to the wrecked vessel on its lease. To injured third parties it was the time charterer of the vessel which had been abandoned by its owner, Bonanza. It is accurate to state that if any liability against Conoco grew out of any reason other than its interest in the vessel, the Republic policy would not cover it. *See St. Paul Fire & Marine Ins. Co. v. Vest Transportation Co.,* 666 F.2d 932, 945 (5th Cir.1982) (per curiam affirmance on the basis of the district court's opinion); *Wedlock v. Gulf Mississippi Marine Corp.,* 554 F.2d 240 (5th Cir.1977); *Lanasse v. Travelers Ins. Co.,* 450 F.2d 580 (5th Cir.1971), *cert. denied,* 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 120 (1972). But in this case, and under this scenario, the liability of Conoco would arise because of the fact that it had brought the vessel to its lease as a result of its interest in the vessel as time charterer. The vessel had then sunk on its lease and had remained there as a hazard to nearby installations if dislodged.

We accept the other findings of the Court, but our disagreement on the issue of the interpretation and application of the "owner, . . . compulsory by law" provisions of the policy which Conoco held with Republic Insurance Company leads us to conclude that the decision of the district court, holding Republic liable to Conoco under the

---

In this provision the parenthetical phrase "as owner..." is obviously inserted to limit liability to instances of damage resulting from the assured's interest in the vessel, so as not to cover, for example, liability of assured for illness or injury which does not result from its interest in the vessel.

It is manifest under the policy that Conoco, as an equal "assured" throughout, was being protected from liabilities for injuries, illnesses and other damages occasioned by virtue of being the charterer as a form of being an "owner" under the policy for these purposes. These provisions were a significant part of the policy to Conoco which had demanded that it be included as an assured under the policy as part of the time charter.

policy for the costs of raising the sunken AQUA SAFARI, should be affirmed.

JOHN R. BROWN, Circuit Judge, with whom TATE, Circuit Judge, joins, concurring in part and dissenting in part:

By way of emphasis I specifically reflect my concurrence with several holdings in the Court's opinion, some of which may or may not be shared by Judge Williams' dissent.

There is, first, the Court's definition of "compulsory by law" leading to the conclusion that "the clause should be so construed that removal does not become compulsory by law only when a court has rendered judgment requiring it or when an official has issued a fiat." Op. p. 1370.

Next, I agree with the use of an objective, not subjective, standard as to the basis for apprehending potential liability. Likewise, I agree with Part IV, denying limitation of liability to Bonanza.[1]

But foremost I concur because of the Court's substantial adoption and approval of *Progress Marine, Inc. v. Foremost Insurance Company,* 642 F.2d 816 (5th Cir.1981). A *reasonable* apprehension of *grave* consequences is compelled by law.[2] After rejecting the subjective standard the Court, following *Progress Marine,* states "[W]e focus on what the *reasonable* assured would have done . . . ." Op. p. 1371. Again, the Court comments:

The test we have adopted, like the one formulated in *Progress Marine,* makes removal compulsory when a reasonable

---

This analysis is confirmed by the lack of any strong attempt by Republic to disavow Conoco as not being an "owner". It undertakes rather to escape liability largely by asserting that any liability of Conoco for damage the AQUA SAFARI might cause would be the result of Conoco's ownership of the lease rather than its interest in the vessel.

1. I agree with the conclusion reached in Part B, Conoco's Duty as Lessee.

2. The Court states it negatively:
 But removal occasioned by a reasonable apprehension of slight consequences for inaction or by an *unreasonable* apprehension even of grave consequences is not compelled. (emphasis added) Op. p. 1370.

owner, fully informed, would conclude that failure to remove would likely expose him to liability imposed by law sufficiently great in amount and probability of occurrence to justify the expense of removal. Op. p. 1372.

After holding that the duty to remove "must be present and unconditional, not remote and contingent," the Court adds—and it is here where I part company and join Judge Williams' dissent:

> In the absence of an established legal obligation to third parties, Conoco was not *reasonably* exposed to liability justifying the cost of removal. (emphasis added) Op. p. 1373.

This holding, in effect, is that unless a statute or recognized maritime judicial decision *today* clearly imposes liability on Conoco, it could have no reasonable apprehension of liability.

But one thing is clear as Judge Williams' extended dissent so clearly demonstrates: in the field of maritime law and particularly the legal complications flowing from technological developments especially in the deep sea offshore area, what was *yesterday* is not necessarily so for *today*, and almost certainly, not for *tomorrow*.

Several cases illustrate this fact of life. First is the Big Sam (*United States v. M/V BIG SAM*, 681 F.2d 432 (5th Cir.1982)) liability for clean up costs under the Water Quality Improvement Act of 1970, the Federal Water Pollution Control Act of 1972, and more specifically, the penalties against a negligent discharger, on the one hand, in contrast to a negligent nondischarging third person causing the discharge. The case precipitated a sharply divided vote on granting en banc and a dissent. 693 F.2d 451 (1982).

The Water Quality Improvement Act is but one of many far reaching complex statutes and numerous international conventions dealing with pollution of the sea and adjacent shores from discharge of oil from vessels, offshore platforms, pipelines, etc. *See, e.g.,* 43 U.S.C. § 1801, *et seq.* Outer Continental Shelf Resource Management Act; 33 U.S.C. § 1001 *et seq.* Pollution of

Sea by Oil Act; 33 U.S.C. § 1501 *et seq.* Deep Water Ports Act; 46 U.S.C. § 391a Ports and Waterways Safety Act; 30 U.S.C. § 1401 Deep Seabed Hard Mineral Resource Act; Sisson, *Oil Pollution Law and the Limitation of Liability Act,* 9 J.Mar.L. & Com. 285 (1978); Higgins, *Pollution: International Conventions, Federal and State Legislation,* 53 Tul.L.Rev. 1328 (1979); Healy, *The C.M.I. and IMCO Conventions on Civil Liability for Oil Pollution,* 1 J.Mar.L. & Com. 93 (1969).

Next is *Nunley v. M/V DAUNTLESS,* 696 F.2d 1141 (5th Cir.1981) now pending en banc. (Cited in n. 13 Op. p. 1374) This Court rejected case law from the Second Circuit on liability of a negligent tort feasor for damage resulting from collision with a sunken wreck not marked by the owner or the United States.

*See also Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967) rejecting traditional notion liability for wreck removal limited to *in rem; Baker v. Raymond International, Inc.,* 656 F.2d 173 (5th Cir.1981) owner of vessel bareboat chartered is liable to a seaman *in personam* in addition to *in rem* liability of vessel.

\* \* \* \* \* \*

With stakes so high—both in governmentally imposed penalties or sanctions and potentially unlimited liability for civil damages for oil pollution—what a prudent assured *reasonably* apprehends is not to be measured by *today's* dead certainty. And an underwriter issuing a policy affording coverage for removal expense "compulsory by law"—as broad as that properly defined by the Court's opinion—must contemplate that its liability will depend on the *reasonable* apprehension of very grave consequences, not a specific decision or decisions of one or more courts.