**In re: The Matter of CENTRAL GULF LINES, INC., and Waterman Steamship Corporation**

**Nos. 97CV3829, 99CV1888.**

United States District Court,
E.D. Louisiana.

June 25, 2001.

Robert B. Acomb, Jr., Richard D. Bertram, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, for petitioners.

Andrew Struben deKlerk, George A. Frilot, III, Joseph Dwight Leblanc, III, Terraplane L.R. Marquez, Frilot, Partridge, Kohnke & Clements, LC, New Orleans, LA, for defendants.

Robert Fenet, William Brett Mason, Breazeale, Sachse & Wilson, Baton Rouge, LA, for claimants.

Christopher Ogilvie Davis, James H. Roussel, Evan T. Caffrey, Phelps Dunbar, LLP, New Orleans, LA, Nicole L. Streeter, Catherine Maraist, U.S. Department of Justice, Washington, DC, for movants.

## ORDER AND REASONS

LIVAUDAIS, District Judge.

These two consolidated civil actions concern the June 19, 1997 collision of the GREEN OPAL, an ocean-going vessel, and LASH barge CG–F70, a dumb, unmanned barge in the tow of the tug KAMRUP in the Hooghly River between Haldia and Calcutta, India. The LASH barge CG–F70 was bareboat chartered to Waterman Steamship Corporation ("Waterman"), the tug KAMRUP was operated by Eastern Navigation Pvt. Ltd. ("Eastern"), a towing contractor operating in and around Haldia and Calcutta, India, and the GREEN OPAL was owned by R.L. Baron Shipping, S.A. ("Baron"). Following the collision, the GREEN OPAL, which was loaded with a cargo of steel, sank in the navigable channel of the Hooghly.

On December 10, 1997, Central Gulf Lines, Inc. ("CGL"), the owner of the LASH BARGE CG–F70, and Waterman, the owner *pro hac vice*, operator, and bareboat charterer of the LASH BARGE CG–F70, filed a complaint for exoneration from or alternatively limitation of liability, which is the lead case, Civil Action No. 97–3829. CGL and Waterman seek to be exonerated from liability, or have their liability limited to the value of the LASH BARGE CG–70, which was stipulated to be $ 96,578.23, with six percent (6%) per annum interest. (Rec.Doc. Nos.1–5).[1]

On June 18, 1999, Baron filed the second suit of this consolidation, captioned "R.L. Baron Shipping, S.A. v. Waterman Steamship Corporation as the time charterer of the Tug KAMRUP", Civil Action No. 99–1888, alleging that Waterman was the time charterer of the Tug KAMRUP, which was operated by Eastern Navigation. Baron alleged in the consolidated suit that the actions of the Tug KAMRUP in failing to keep her tow free of the navigable channel for the passage of the GREEN OPAL and in towing five laden LASH barges in tandem with an underpowered tug were the causes of the collision and losses to Baron. Baron further alleged that the actions of the tug KAMRUP were within the sphere of control and responsibility of Waterman, as set forth in the agreement, and extensions and amendments thereto, between Waterman, or its Shipping Agent, and Eastern Navigation.

Among several others[2], the following motions have been filed by the parties:

1) Motion of CGL to dismiss claims and alternatively for summary judgment;

2) Motion of Waterman and CGL to dismiss claims and for summary judgment against the United States;

3) Motion of Baron that it intends to raise issues concerning laws of India.

4) Motion of Waterman to dismiss claims and alternatively for summary judgment;

5) Motion of Baron, Mashiro Toyoda, Hajime Ono, Tashiaski Takeuchi, Dooyang Line Co., Dooyang Ship Management Co., and United Kingdom Protection and Indemnity Assurance Association (Bermuda, Ltd.), for partial summary judgment on privity or knowledge issues;

6) Motion of Baron for partial summary judgment on the status of Waterman as time charterer for the Tug KAMRUP;

Oral argument was requested, granted, and heard on these motions on April 25, 2001. No opposition to (1) the motion of CGL to dismiss claims and alternatively for summary judgment; and (2) the motion of Waterman and CGL to dismiss the claims and for summary judgment on the claims of the United States was filed. Counsel for the United States did not attend the hearing on the motions, and when the Court inquired whether there was any

---

1. On June 26, 1997, Baron filed a complaint in this court captioned "R.L. Baron, S.A. v. Central Gulf Lines, Inc., et al", Civil Action No. 97–2016, wherein Baron alleged that Central Gulf Lines was liable for the collision and loss of the GREEN OPAL and the cargo and wreck removal expenses. Baron voluntarily dismissed the complaint and filed a petition in Civil District Court asserting the same cause of action. CGL and Waterman subsequently filed the instant limitation action, and this Court issued the customary order restraining the filing of any new suits

and staying the continued prosecution of any previously filed suits asserting claims arising out of the June 19, 1997 collision in the Hooghly River, in accordance with the Limitation of Liability Act. Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims, Federal Rules of Civil Procedure, 28 U.S.C., 46 U.S.C. sec. 185 *et seq.*

2. Numerous other motions were filed, but for purposes of simplicity and clarity, only these six motions will be decided herein.

opposition to these two motions, no opposition was voiced. The Court granted these unopposed motions and took the opposed motions under advisement.[3]

Opposition memoranda was filed to the other motions, and oral argument was heard in support of and in opposition to the motions.

### Relevant Facts

CGL is the owner of the ocean-going LASH mother vessel M/V GREEN ISLAND and the LASH barge CGL–F70. Both of these vessels were bareboat chartered to Waterman, a steamship corporation based in New Orleans. Waterman and CGL are owned by International Shipholding Corporation ("ISC"). Waterman operates the GREEN ISLAND in service from the port of New Orleans to the Red Sea area, India, and in Southeast Asia. In June, 1997, the GREEN ISLAND transported a number of LASH barges loaded with grain cargo from New Orleans to Haldia, India. LASH barge CG–F70 was a dumb, unmanned barge owned by CGL and bareboat chartered to Waterman. Both the GREEN ISLAND and LASH barge CG–F70 were documented vessels of the United States and certificated by the American Bureau of Shipping and the United States Coast Guard following periodic inspections.

The LASH system is a unique system of maritime transportation developed in the 1960s and 1970s. The term "LASH" is an acronym for "Lighter Aboard Ship." In *Wirth, Ltd. v. S/S Acadia Forest*, 537 F.2d 1272 (5th Cir.1976), Chief Judge Brown succinctly summarized the essence of LASH operations, as follows:

> The basic principle [of the LASH system] is that an ocean vessel [referred to as the mother ship or the mother vessel] is designed to lift on board and carry specially designed barges which are fully loaded with cargo. The barges [referred to as LASH barges] are loaded at remote points on inland rivers or other waterways which are inaccessible to deep draft ocean vessels. The barges are then towed from the inland ports where they receive the cargo to the deep water port where they rendezvous with the ocean vessel and are loaded aboard for the ocean segment of the journey. At the deep water port of destination, the barges are unloaded and towed to inland ports or places for discharge at the agreed destination. A principal advantage of the concept is that throughout the course of shipment the cargo

**3.** After the instant motions were filed, the Baron interests filed a motion for leave to reopen discovery for the limited purposes of completing the Letters Rogatory in India. The Baron interests requested the issuance of Letters Rogatory in India in order to depose a number of witnesses there who were outside the subpoena power of this court. Counsel for Waterman/CGL and the Baron interests traveled to Calcutta, India and deposed a number of witnesses. Oceanic and Eastern Navigation witnesses identified in the Letters Rogatory opposed the convening of a commission by the Indian court to take their testimony and sought relief from the High Court of Calcutta. The High Court of Calcutta had not ruled upon the request from the Oceanic and Eastern witnesses at the time counsel were in Calcutta and thus those witnesses were not deposed. Shortly after the instant motions were argued, the High Court of Calcutta dismissed the application of the Oceanic and Eastern witnesses to dissolve the commission appointed to take the depositions requested in the Letters Rogatory. The Court granted in part the motion of the Baron interests for leave to reopen discovery, allowing the depositions of Ghopal K. Bhattacharji, the Chief Executive of Oceanic, Waterman's agent in Calcutta, Yaswant Kumar Singhee, the President of Eastern Navigation, Waterman's towage contractor in Calcutta, and Rathindra Nath Dutta, an Eastern employee and the master of the tug KAMRUP on the day in question, to be taken. The testimony of these three witnesses was reviewed in the consideration of the pending motions.

never leaves the barge eliminating the cost, time, and pilfering hazard of break-bulk handling. In an operational sense each stage of the process is a part of the integrated whole transportation system. To service its fleet of LASH mother ships the carrier built over 400 LASH barges which were deployed to effectuate loading or discharge of the contained cargo before or after the mother ship's arrival or departure.

537 F.2d at 1274. This is exactly the manner in which the GREEN ISLAND transported her cargo of LASH barges, including LASH barge CGL–70, to Haldia, India in June, 1997.

Waterman was the only LASH operator in the world in 1997 and is presently the only LASH operator world-wide. Peter Johnston, Waterman's Vice–President of Operations, describes a typical voyage for one of its four LASH mother ships, the GREEN ISLAND, the SAM HOUSTON, the STONEWALL JACKSON, and the ROBERT E. LEE:

> The ship arrives in New Orleans, discharges her full load of LASH barges and reloads another full set of LASH barges for the outbound voyage, which takes approximately three days.

> After departure from New Orleans, the ship proceeds to the Suez Canal, drops barges—on a normal voyage, we drop barges at Alexandria, Egypt, pick up barges at Alexandria, Egypt, proceed through the Suez Canal and calling various ports, the major ones being Port Sudan and Djibouti and, from time to time, Assab. The ship then continues to the Indian sub continent and may or may not call in Karachi, Pakistan, and then to India, and proceeds to various ports on the West Coast of India, and then up the East Coast of India, discharging barges and reloading barges along the way.

> In all the ports that we call, our operation has been in existence for some time and has been refined over the years of our operation there. There is long-standing agreements between ourselves, our agents and our towage contractors. . . . . [T]he operations are done differently at different ports. However, it has been refined over the years, and each unique port has developed a unique method, based upon the existing equipment, port conditions, etc., for carrying out the operation. . . .

> After India, the ship proceeds to Singapore, various ports, sometimes in Indonesia, Thailand, before proceeding back to the United States via the Suez Canal, to discharge her export barges for outbound journey.

Deposition of Peter Johnston, Vol. II, Sept. 3, 1999, pp. 65–67

Prior to the arrival of a LASH mother ship to a discharging port, the Master of the vessel typically faxes or telexes Waterman's local agent to identify which barges will be discharged, the number of barges to be discharged, the barge numbers and the sequence of offloading, and the barges to be loaded back aboard the mother ship before the vessel departs. Deposition of Peter Johnston, Vol. II, Sept. 3, 1999, p. 67. Waterman's general agent is copied on the communication.

In June, 1997, and at relevant times prior to that date, Marco Shipping in Singapore, whose principal is Manik Shahani, was the general agent for Waterman in Southeast Asia.[4] Oceanic Shipping Agency Pvt. Ltd. ("Oceanic"), a privately owned company operating in India, was the local agent to Marco Shipping regarding Waterman's LASH barge operations in Haldia and Calcutta, India. Oceanic had a major office in Calcutta and a smaller branch

---

4. Mr. Shahani is also a Waterman vice-president.

office in Haldia. Other agents handled Waterman's business in other Indian ports.

In typical fashion, in June, 1997, the GREEN ISLAND telexed agents Marco and Oceanic, advising them of the vessel's estimated time of arrival in Haldia, India and the number of LASH barges to be offloaded in Haldia. After arriving in Haldia, the GREEN ISLAND, which draws too much water and is unable to navigate the Hooghly, offloaded its LASH barges, including the CG–F70, by using the ship's crane to place them in the water. As soon as the LASH barge was dropped from the mother ship into the water, the barge was received by an Eastern Navigation tug, which took it to the fleeting area and returned to receive the next barge being discharged. Eastern's tug, the KAMRUP, whose master on the day in question was Rathindra Nath Dutta, took possession of the barge and brought the LASH barge CG–F70, and the other LASH barges transported to Haldia aboard the M/V GREEN ISLAND, and tied them to a buoy in a fleeting area in an inlet to the main river. A watch tug was kept in the area to ensure that the LASH barges were safely afloat until they are moved. Deposition of Rathindra Nath Dutta, May 11, 2001, p. 64–65; Deposition of Ghopal K. Bhattachaji, May 17, 2001, p. 53.

Eastern Navigation Private Limited ("Eastern"), owned and operated by the Singhee family of Calcutta, India, operates tug boats, including the KAMRUP, in the Hooghly River in India. There were agreements dating back to 1974, which shall be discussed in detail *infra,* wherein Eastern operated tugs which towed Waterman's LASH barges up the Hooghly River from Haldia to Calcutta, a distance of approximately 80 miles. Eastern has been registered in India since 1956 and has

serviced a variety of clients ranging from shipping companies, shipping agents, the Calcutta Port Trust, construction companies, and marine construction companies. It operates various tugs, barges, mooring boats, and pilot boats. In 1997, it basically operated various tugs, including the HOLLAND, a 1500 horsepower tug which was drydocked during June 1997 for a major overhaul, the WATERMAN, and the KAMRUP, a 560 horsepower tug, and smaller tugs of 160 to 200 horsepower, which worked inside the locks. Eastern not only provides towage services, but undertakes dredging and salvage operations. In 1997, Eastern operated 17 vessels and had 140 employees, including office personnel and vessel personnel. Deposition of Yaswant Kumar Singhee, May 16, 2001, pp. 9–12, 29–33.

The discharge of the LASH barges from the M/V GREEN ISLAND began at 9:00 a.m. on June 16, 1997 and was completed at 1:38 p.m. on June 17, 1997. Sometime thereafter, the M/V GREEN ISLAND departed the port of Haldia and was at sea in the Indian Ocean enroute to Phuhet, Thailand on June 19, 1997.

The barges are offloaded pursuant to a sequence, or list, prepared by Waterman and sent to general agent Marco Shipping. Marco sends the sequence to Oceanic, who provides it to Eastern's supervisors. Bhattacharji deposition, p. 78; Singhee deposition, p. 26. The import LASH barges are towed by Eastern to the fleeting area at Haldia, and after the mother vessel completes the discharge of the LASH barges, Eastern tows them from Haldia to Calcutta inside the docks, where they are tied alongside the jetties marked for the LASH barges. If there are any export barges inside the dock, Eastern tows them from the docks of Calcutta to the fleeting area in Haldia.[5] Singhee deposition, p. 21.

---

**5.** Import barges are barges which the mother vessel brings into India loaded with cargo

After the GREEN ISLAND departed port, Tugmaster Dutta waited for 1½ days for the tidal conditions, and then decided what barges to tow with his tug. Dutta deposition, p. 66. On June 19, 1997, as on all other days, the decision of how many barges to tow with what tug was made by Eastern's tugmaster. Dutta deposition, p. 66. This is consistent with the testimony of Mr. Bhattacharji of Oceanic, Waterman's local agent in Calcutta and Haldia, and with that of Mr. Singhee of Eastern. Singhee deposition, p. 120. Mr. Singhee testified that Eastern never had any discussions with Waterman, Oceanic, or Marco as to the maximum number of LASH barges that could be towed by any particular tug. Singhee deposition, p. 157–158.

As explained by Mr. Bhattacharji of Oceanic in response to the question who makes the decision regarding how many barges will be placed in a tow from the fleeting area in Haldia to Calcutta:

> That is up to Eastern Navigation. We give them our schedule that we need these barges so and so on so and so date, within so and so date, and they have to arrange the towage, and they tow the barges. We don't decide which barge to be taken, how to be taken. I mean, it's their job. They have the experienced people. We are there only to give them information, direction, coordinate with them. That's all we do. It's up to them to do the actual job, which includes the transportation of the barges from Haldia to Calcutta dock system and Calcutta to Haldia.

Bhattacharji deposition, p. 55. Mr. Bhattacharji also explained that the decision as to the build-up of the tow is likewise made by the respective masters of the tugs. Bhattacharji deposition, p. 56.

Singhee of Eastern explained that Eastern's supervisors tell the masters which barges are to be transported to Calcutta and that the tugmasters determine how many barges to take based upon each master's own personal experience, considering weather conditions, wind force, tidal conditions of the river, and the draft of the barges. Singhee deposition, pp. 35–36. He stated that the KAMRUP has towed five loaded barges from Haldia to Calcutta many times. Singhee deposition, p. 42.

On this occasion, as was typical, after the LASH barges were placed in the water, no one from the M/V GREEN ISLAND, from Oceanic, or from Marco, boarded the tug KAMRUP, or traveled on the KAMRUP while it towed the LASH barges to Calcutta. Dutta deposition, p. 102–103; Singhee deposition, p. 101, 158–159. Dutta, the master of tug KAMRUP, a 20 year-old 85 foot twin screw vessel of 560 brake horsepower, bareboat chartered by Eastern from Ms. Kamal Kumari Surana, a relative of the family, decided to tow five LASH barges on this trip to Calcutta, fixing them tandem with CG–F70 as the lead barge. Singhee deposition, p. 35. Tugmaster Dutta held a Certificate of Competency as Second Class Master under the provisions of the Inland Vessels Act issued by the Government of West Bengal, had been employed on similar tugs for 12 years, had been Master of the KAMRUP for 3 years, and had worked only on the Hooghly River during that time. He was very experienced in handling the tug and tow under various tide and weather conditions. There was a crew of 12 persons working on the KAMRUP in June, 1997, including deckhands, a quartermaster, second master, and a cook. Dutta deposition, pp. 43–44, 63.

On the day in question, the lead barge of the five barge tow of the KAMRUP was the LASH barge CG–F70. As was the

---

from other countries. Export barges are barges which have been loaded with cargo from India destined for delivery to other countries. Singhee deposition, pp. 25–26.

practice at all times, Eastern employees had made up the tow for the 80 mile trip, with the tug made up on the hip to the last barge.

The Hooghly River has a navigable channel which is constantly dredged to maintain its navigability for ocean-going vessels, but contains several bars through the accumulation of silt. The Hooghly is also affected by spring tides, increasing the water current. At the time of the collision, the river was experiencing a flood tide, with a 3 knot current, flowing from Haldia to Calcutta. Singhee deposition, p. 133.

On June 19, 1997, the M/V GREEN OPAL was proceeding down the Hooghly River from Calcutta toward Haldia with its Master and a Calcutta Port pilot on the bridge. According to its deck log, for one hour prior to the collision it was operating at full ahead and was ordered to half-ahead approximately 30 seconds prior to the collision. There were no obstructions to view at the time.

The GREEN OPAL's pilot testified that when he first observed the KAMRUP tug, it was outside of the navigation channel on the western side of the river, or left hand side going up. There are conflicting reports on the exact location of the KAMRUP and her tow shortly prior to the collision. The KAMRUP sounded her whistle twice, and when the GREEN OPAL approached, reversed engines. The

GREEN OPAL issued three starboard helm orders, altering her course rapidly to starboard. The GREEN OPAL collided with LASH Barge CG–F70, the first barge of the tow, on its port corner. While there was a soft mud-bank adjacent to the spot of the collision, the GREEN OPAL did not beach itself in the bank, but steered into the navigable channel and sank there, obstructing it. Its crew abandoned ship and were rescued.[6]

The Indian Government issued a wreck removal order. The United King Mutual Steamship Assurance Association (Bermuda) Ltd., ("U.K. Club"), the insurers of the M/V GREEN OPAL, arranged for salvage operations for the cargo and wreck removal, which proved to be an expensive venture. The services of first salvor, Tsaviliris Russ, were terminated at great expense to the U.K. Club, and a second salvor removed the wreck and the cargo. The owners of the GREEN OPAL, R.L. Baron, and the U.K. Club, the insurer of the GREEN OPAL and the subrogated underwriter of the steel cargo, are seeking approximately $ 14 million in damages from Waterman. This figure includes the complete loss of the GREEN OPAL, cargo loss and damage, and wreck removal expenses, which comprise the bulk of the damages.

Because Waterman, a New Orleans-based shipping company, is a global concern and operates a liner service in India

---

6. For purposes of the Waterman motion to dismiss or alternatively for summary judgment, the evidence is conflicting regarding collision fault. The Report by the Nautical Adviser to the Government of India on the sinking of the M/V GREEN OPAL on June 19, 1997, suggests that both the Tug Master and the M/V GREEN OPAL pilot were at fault. While Waterman strongly objects to the admission of the Report, the Nautical Adviser notes that against the strong flood current, the KAMRUP would have had a difficult time maneuvering with a five barge tow and was

apparently attempting to cross the river at the time of the collision, but was unable to cross rapidly enough to avoid the collision. The GREEN OPAL, an ocean going vessel, was more maneuverable, but was proceeding rapidly and did not slow down in enough time to avoid the collision. Regardless of the conclusions that can be reached from the report, considering it and the deposition testimony and the expert reports, it is sufficient to note that the facts on the causes of the accident conflict.

and Southeast Asia, it is necessary for it to use ship's agents in foreign ports. Effective September 1, 1989, and continuing to the present, Waterman entered into a "General Agency Agreement" with Marco Shipping. The territory covered in the agreement between Waterman and Marco Shipping was Pakistan, India, Bangladesh, Sri Lanka, Burma, Thailand, Malaysia, Indonesia, and Singapore. The General Agency Agreement with Marco required Marco to represent it, to recommend and/or appoint port and inland agents, stevedores, watchmen, tallymen, terminal operators, suppliers, to coordinate marketing and sales activities, to maintain appropriate records and monitor accounting records of the Principal's bank accounts, to check Port Agents accounts, and to calculate freight and other charges. Nothing in the General Agency Agreement required Marco Shipping to operate or navigate any vessels, or to supervise the navigation, technical aspects of safe handling or construction of the tow, or to make decision regarding which tug was to tow which barges. Formerly, Havtar owned a 50% interest and ISC (International Shipholding Corporation, the parent company of Waterman) owned a 50% interest and but now ISC owns 100% of it. The principal in Marco Shipping is Mr. Manik Shahani, a Waterman vice-president, who is based in Singapore. Marco Shipping has been the General Agent for Waterman in Southeast Asia for 20 years.

Because of the vastness of Marco's territory, it made arrangements for Waterman to contract with local agents in various locations throughout Southeast Asia. As previously noted, Waterman entered into a Liner Agency Agreement with Oceanic to be is local agent in Calcutta and Haldia. Neither Waterman nor ISC has any ownership interest in Oceanic. The Liner Agency Agreement between Waterman and Oceanic specifies that Oceanic is to act as the port or inland agent for Waterman in its territory, which is the port of Calcutta. Oceanic agreed not to represent any other principals in direct competition in Calcutta, but Waterman was the only LASH operator in the world in 1997. The agreement requires Oceanic to provide marketing and sales activities, public relations, statistics and information, and cargo bookings, to arrange for the berthing of vessels and the loading and discharging of cargo, coordinate stevedores, terminal operators, and other contractors, to arrange for bunkering, repairs, crew changes, and medical assistance, to provide any necessary claims handling, general average, or surveyor appointments, to attend to all necessary cargo documentation, and to provide for appropriate records. In short, Oceanic was to perform as any customary ship's port and inland agent would.[7]

---

7. Mr. Bhattacharji described Oceanic's duties and responsibilities under its contract with Waterman as its local ship's agent to Waterman's vessels as follows:

Once we receive the appointment of the agents, we communicate with the principals to get all required information to observe statutory formalities with the Calcutta Port Trust and Calcutta Custom. It is to be noted here that Haldia Dock Complex is not considered as a separate port. It is a dock system under the management of the Calcutta Port Trust. Therefore, when ships come to Haldia, we do all the official formalities out of Calcutta. Once we receive the required documents, such as manifests,

bills of lading, we do the formalities of the customs. That is called the entry of the vessel inward. We file the manifest into the vessel and then inform the port authorities at the same time. We keep track on the movement of the vessel by keeping close contact with the principals to assess what is the vessel's ETA so that we can lyase with the respective parties. That can either be the importers with the vessels bringing in import cargo or with exporters if the vessel is calling for loading of the export cargo.

Once the vessel comes, we have various persons there for particular operations. Those persons attend to all of the requirements of the vessel, including custom, por-

There is no requirement that Oceanic navigate any vessels, accompany the cargo on the tug to assure proper navigation, or to perform any functions relating to the navigation of any vessels. As a practical matter, Oceanic personnel are consumed with their myriad responsibilities, and do not board the tug or accompany it from Haldia to Calcutta with the LASH barges in tow.

On March 21, 1974, Waterman and Eastern Navigation Private Limited entered into a Memorandum of Agreement, which was in effect in June 1997 and remains in effect to date. While there have been changes in the financial aspects of the contract, the operational provisions and responsibilities have remained constant since 1974, through 1997, up to the present. Singhee deposition, p. 11. The original agreement contains several key provisions, including the following:

> *Whereas* the said Principal [Waterman] carries on business in Calcutta through its Agents, [Angus, the port agent which preceded Oceanic in Calcutta], *AND WHEREAS* the said Waterman Steamship Corporation intends to operate their LASH vessels (hereinafter called the "Mother Ship") to Calcutta Port which vessels due to the size and draught will normally anchor in the vicinity of Haldia,
>
> *AND WHEREAS* the said Principal has approached the said contractor [Eastern] for undertaking the **towage** work of the LASH barges i.e. to receive the LASH barges from the said Mother Ship, to tow them into some fleeting

area or areas in or around Haldia and to bring them inside the Calcutta Docks— Nataji Subhas Docks or Kidderpore Docks or any other places as may be found suitable from time to time under the directions of the Agents, holding the said barges in the fleeting area and to move them to the loading and unloading points as directed and to take them back under the direction of the Agents to Haldia fleeting area and ultimately for loading them on the said Mother Ship. *AND WHEREAS* the said Contractor has agreed to undertake said work on the following terms and conditions:

*NOW IT IS HEREBY AGREED AND DECLARED* as follows:

1. For the purpose of carrying out the aforementioned towing operation the Contractor shall purchase and/or procure suitable tugs as may be approved by the Agents in writing for the various stages of the operation. The entire operation is required to be performed with the help of three tugs—of which one tug should be a very powerful one of a capacity of minimum 1500 h.p., another of a capacity of 500 to 700 h.p. or more and a third one may be a small launch mainly for moving the said LASH barges from one place to another inside the docks. It is understood that all those tugs will be under the sole approval of the Agents aforesaid.

2. The Contractor shall insure the said tugs fully including all third party liability.

---

tal, immigration formalities on board the vessel with required documents.

Our operational people, they go on board the vessel, meet the master, chief officer, and work out the loading or discharging plan, and then it is followed up by informing the respective parties, such as stevedores, importers, exporters, etc.

This is a process in continuation till the vessel's operation is completed and the ves-

sel is sailed from the port. After that, we have other formalities, again, with the statutory authorities like Port Trust and Customs. We follow that as per the requirement of the law of the land.

In brief, this is our responsibilities as far as the ships agents are concerned toward the vessel.

Bhattacharji deposition, pp. 8–10.

3. The Contractor will not be entitled to use the said tugs and equipment for **LASH·vessels of any company other than those belonging to or chartered by the Principal.**[8] Those tugs are meant to be operated only within the area of Calcutta Port i.e. between sandheads and Calcutta. However, when free from Lash operations with Contractor may with the prior permission in writing of the Agents, do some other work in Calcutta Port.

4. Ordinarily, but not exclusively, barge operation will mean and include the following under direction of the Agents:

 a) Receiving the Lash barges at the water level from Mother Ship as and when they are lowered.

 b) Safe handling and controlling of Lash barges as soon as they are floated on the water.

 c) To tow the Lash barges to a fleeting area or areas in or around Haldia or to any other place as may be found suitable.

 d) To tow from the said fleeting area in Haldia, loaded or empty lash barges, to fleeting areas inside the Calcutta Docks as may be directed by the said Agents.

 e) To move the Lash barges form one place to another inside the Calcutta Docks, as may be required, for the loading and/or unloading purposes to and from the fleeting area as mentioned in Clause (d) above.

 f) Likewise to tow the Lash barges from the fleeting area in Calcutta Docks to the fleeting area in Haldia and from there to the side of the Mother Ship for loading them on to the Mother Ship as and when required, strictly under the schedule chalked out by the Agents.

\*  \*  \*  \*  \*  \*

9. **The Contractor shall ensure safe towing and handling of the barges in tow.**

**(Bold emphasis added).** Exhibits to Waterman's Motion to Dismiss and Alternatively for Summary Judgment, Exhibit 1, attachment C.

This contract was renewed from 1974 to the present and is still in effect. The renewed contract documents indicate negotiations by Eastern for higher payments for the barge towage provided for in the contract. For instance, by letter dated March 14, 1986, R.C. Singhee, the managing director of Eastern, sent a letter to The Angus Company, the Calcutta agent for Waterman, clarifying specific points in paragraphs 2 and 6 and clarifying a particular point regarding the Tug Holland.

The HOLLAND was a large 1500 horsepower tug. The March 11, 1977 three year extension provides in paragraph 2 "Event contract terminated as in (1), Waterman to be responsible for bareboat charter hire and insurance charges for only 'Holland' for balance period up to February, 1980. Any use of 'Holland' by Eastern for their purpose to reduce this maximum liability."

The February 20, 1985 contract renewal provides in relevant part:

1. Monthly Rs. 225,000 (rupees)/-minimum up to 120 barges round trips in the year. This will cover only Holland for the main towage operation and also two small tugs each within Calcutta Docks (K.P.D. or N.S.D.) and at Haldia. It was clearly understood that Holland will be kept in

---

**8.** Waterman operated the only Lash mother ship in the world and thus was the only company that transported Lash barges. In addition to the GREEN ISLAND, it has three other Lash mother ships. In LASH operations, Waterman had no competitors in 1997.

perfect working condition all the time for the use of Waterman work only and, if at all, it is held up for repairs and/or for any other reasons (which must be discussed with use) Eastern will make alternative suitable arrangements for **towage operations in place of Holland at their own cost.**

Over and above Holland or tug/tugs replacing Holland as stated above, in the event a second tug is required, Eastern will ensure that such service is so provided for which they will be paid for extra. **For this purpose, it is clarified that a suitable good tug capable of operation and towage will be made available whenever required.**

**(Bold emphasis added).** Exhibits to Waterman's Motion to Dismiss and Alternatively for Summary Judgment, Exhibit 1, attachment F.

The documents and the affidavits and deposition excerpts in this voluminous summary judgment record leave no doubt that the negotiations between Eastern were arms length transactions between a principal and a contractor. Eastern always sought more money for their services every time the contract was renewed. Eastern is and was owned by the Singhee family and there is no evidence that either Waterman, Marco, or Oceanic had any ownership interest in Eastern.

At the time of the collision, the HOLLAND was in dry dock for repairs and Eastern had bareboat chartered the tug KAMRUP to perform necessary towage services for Waterman. While Oceanic was informed that the HOLLAND would be in drydock for a period of time, there is no indication that Oceanic, Marco or Waterman participated in any negotiations to charter the KAMRUP.

From 1989, when Oceanic became Waterman's local ship's agent in India, until the date of the instant collision, a period of 8 years, Eastern's tugs were not involved in a single accident or collision while towing a Waterman barge. Bhattacharji deposition, p. 30. Oceanic was highly satisfied with the performance of the tugs operated by Eastern and the ability of the Eastern tugs to accomplish the towage operation for LASH barges in the Hooghly River. Bhattacharji deposition, p. 129. Mr. Bhattacharji, Oceanic's Chief Executive Officer, testified with respect to whether Oceanic considered factors other than history in evaluating Eastern's performance under its contract:

It was not necessary for us to look at that issue because the fact, as I stated earlier and I have repeated, the performance has been absolutely without any doubt fully efficient, without any bad incident, either loss of cargo, damages to barges, damages to any third-party property, damages to the tug. So, therefore, it was not necessary for us to look into any such matters concerning the towage contract with Eastern Navigation.

Bhattacharji deposition, p. 131.

Waterman's experience with Eastern prior to June 19, 1997, spanned 23 years. It had no knowledge of other collisions or groundings of involving the Tug KAMRUP prior to 1997. Johnston deposition, Sept. 2, 1999, pp. 197–199. Based upon its history with Eastern, Waterman had no reason to doubt Eastern's ability to tow its barges in accordance with the contract and left the responsibility for the manner and method of the towage of the barges with Eastern. Johnston deposition, Sept. 2, 1999, pp. 173–175.

### The Motions

*Motion of R.L. Baron that it intends to raise issues concerning the laws of India.*

■ The first question to be considered is choice of law, which is the essential point

of Baron's motion that it intends to raise issues concerning the laws of India. Baron suggests that the court conduct a choice of law analysis of this maritime tort claim using the procedure in *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), and *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). The seven *Lauritzen* factors relevant to choice of law questions are (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured party; (4) the allegiance of the defendant shipowner; (5) the place of the contract; (6) the inaccessibility of the foreign forum; and (7) the law of the forum. *Lauritzen,* 73 S.Ct. at 928–932. The Supreme Court in *Rhoditis* added the shipowner's base of operations. 90 S.Ct. at 1734.

■ In its memorandum in support of the motion, Baron conducts such a choice of law analysis and concludes that Indian law should govern the maritime tort claim herein. While the Indian Rules of Inland Navigation that govern navigation on the Hooghly River will certainly be relevant to the determination of maritime navigational errors inherent in determining the fault of the vessels involved, an analysis of these choice of law factors strongly lean toward application of American maritime law respecting limitation of liability issues, such as privity or knowledge, responsibility of the vessel owner for the navigational errors of the master, whether the contract is one of towage or a time charter, the liabilities of a time charterer or a party to a towage contract. While the collision took place in the Hooghly River in India, thus making India's Navigation Rules relevant, the law of the flag of the vessel, the CG–F70, on which Baron seeks to foist responsibility is the United States. The parties involved in the collision have a number of domiciles, including Panama, which is the domicile of THE GREEN OPAL, a Panamanian flag vessel and the domicile of R.L. Baron, a Panamanian corporation, Japan, Korea and China, the domiciles of the Baron directors, the United Kingdom, the domicile of the primary underwriters, the U.K. Club in London, and Bermuda, Japan, Hong Kong and Norway, the domicile of the nominal insurers. The domicile and allegiance of the defendant shipowner is the United States. The place of the contract between Eastern and Waterman, or Waterman's local agent, is India.

The next *Lauritzen* factor is the inaccessibility of the foreign forum. The claimants specifically chose to file suit in this Court initially, which impelled Waterman to file the exoneration/limitation action. The Indian courts were open to Baron, but they chose not to use them.

The next factor, the law of the forum, is American law. The shipowner's base of operations against whom damages are sought is also the United States.

While Baron suggests that the application of Indian law is most appropriate given the *Lauritzen,* and *Rhoditis* factors, throughout its memoranda on the questions of exoneration, limitation of liability, time charter status, towage, and agency, it repeatedly cites American law. As previously discussed, a review of those same factors which lead Baron to resolve the choice of law question in favor of the application of Indian law leads the Court to the conclusion that American maritime law is applicable to those issues, but due consideration will be paid the rules of Indian navigation, when appropriate.

*Motion of Waterman to Dismiss Claims and Alternatively for Summary Judgment*

■ Waterman moves to dismiss all claims against it in these consolidated actions arising from the June 19, 1997 collision. It contends that as to the following,

there are no material issues of fact in dispute and it is entitled to judgment as a matter of law. It argues:

1) Waterman was the owner *pro hac vice* and bareboat charterer of LASH barge CG–F70;

2) LASH barge CG–F70 is a dumb, unmanned barge with no motive power in the tow of the tug KAMRUP, which provided motive power and navigated all barges;

3) As the barge owner, it relied on the tug to make up the tow properly and navigate its barges;

4) There are no facts in the record which support a finding that Waterman was negligent in relying on the tug to make up the tow and navigate the barges to their destination.

In support of this argument, Waterman relies on *In Re Kristie Leigh Enterprises, Inc.*, 72 F.3d 479, 480–81 (5th Cir.), *reh'g denied*, 81 F.3d 159 (5th Cir.1996). The *Kristie Leigh* involved a collision between a tug which was towing barges and two fishing boats. The district court exonerated the barge owner, but denied limitation to the tower/tug operator, finding that the towing company had "constructive knowledge of Captain Rogers' negligence on grounds that neither its president nor its port captain possessed enough expertise to determine whether the ships' masters they employed acted reasonably." 72 F.3d at 480–481. In determining that the towing company was negligent, the district court noted that the tower was unable to configure the tows properly, evaluate whether additional crew was necessary for a larger than normal load, did not ensure compliance with the Inland Rules of Navigation, and failed to hold safety meetings, enact safety policies, or inquire into their captains' operational decisions.

The Fifth Circuit reversed the district court's denial of limitation to the towing company (the district court had already

exonerated the barge company), holding in pertinent part:

The only issue we address, therefore, is whether the district court erred in concluding that Gateway could not limit because it failed to exercise reasonable diligence in discovering similar navigational errors Captain Rogers had made earlier and because it did not provide better training and supervision.

We have found no decision of the Supreme Court or this Court that supports denial of limitation under the facts as found by the district court. In *Coryell v. Phipps*, 317 U.S. 406, 412, 63 S.Ct. 291, 294, 87 L.Ed. 363 (1943), the Court held that "[O]ne who selects competent men . . . and who is not on notice . . . cannot be denied the benefit of . . . limitation." In *Mac Towing, Inc. v. American Commercial Lines*, 670 F.2d 543, 548 (5th Cir.1982), we noted that "[o]rdinarily 'errors in navigation' or other negligence by master or crew are not attributable to [the shipowner] for limitation purposes."

In *Continental Oil Co. v. Bonanza Corp.*, 706 F.2d 1365 (5th Cir.1983) (en banc), we stated: "[N]o court has previously denied a corporate shipowner limitation of liability for a master's navigational errors at sea when the owner has exercised reasonable care in selecting the master." 706 F.2d at 1377 n. 15. In *Tittle v. Aldacosta*, 544 F.2d 752, 756 (5th Cir.1977), we stated that:

Ordinarily [limitation] is to afford protection to the physically remote owner who, after the ship breaks ground, has no effective control over his waterborne servants. Thus the errors in navigation or other negligence by master or crew are not attributable to him on respondeat superior for limitation purposes. **In the typical situation of a corporate owned ocean**

vessel the privity and knowledge scrutiny focuses in on whether the shore-based high-level management is aware (or should have been) of the likelihood of the occurrence happening after the ship is underway.

The district court did not find that Captain Rogers was an incompetent master, and the record would not support such a finding. Captain Rogers was a properly licensed tug captain with over thirty years of experience. With the exception of one accident, Captain Rogers had a clean record. No evidence suggested that Gateway knew or should have known that Captain Rogers had previously committed navigational errors. Without knowledge by Gateway that its captain was inadequate or unsafe the record does not support a conclusion that Captain Rogers was incompetent and needed additional training or instruction in performing his duties....

... Gateway had no knowledge that Captain Rogers was in any way inadequate as a master. The record does not suggest that any complaints were ever filed against him or that anyone ever reported to Gateway that Captain Rogers had improperly navigated his vessel. An employee's negligence at sea, without more, is not enough to deny limitation. *See* Grant Gilmore & Charles Black, Jr., *The Law of Admiralty,* 894–95 (2d ed. 1975) ("So long as the Limitation Act is on the books, the owner will of course be entitled to limitation for events which occur during the voyage which lie beyond the possibility of his control.")

In short, the record presents no justification for departing from the well established rule that, for limitation purposes, an owner may rely on the navigational expertise of a competent ship's master. We therefore reverse the district court's judgment denying Gateway's petition to limit its liability and remand this case for further proceedings consistent with this opinion.

72 F.3d at 481–482.

The party moving for limitation here is the tow, not the tug. The barge owner here is a shipowner who operates worldwide and whose ocean going mother ships routinely travel from New Orleans to the Middle East and Southeast Asia, offloading barges in the Red Sea area, Haldia, India, Thailand, Pakistan, Sri Lanka, Singapore, and at other ports throughout the world. Its experience with the tug operator in question has been excellent for nearly 30 years.

Quite succinctly, there is simply an absence of evidence in the record establishing that either Waterman, its local agent, Oceanic, or its general agent in Singapore, Marco, were aware, or should have been aware, of the likelihood of this accident after the tug was underway. *Kristie Leigh,* 72 F.3d at 481–482. No personnel of Waterman or Oceanic boarded the tug after it took control of the LASH barge once it was placed in the water by the GREEN ISLAND's crane. No personnel of Waterman or Oceanic instructed Eastern's supervisors or tugmaster on the proper method of constructing the tow, or the maximum load the KAMRUP could push under the weather, wind, and tide conditions existent at the time. There is no evidence that Waterman or Oceanic even observed Eastern personnel constructing the tow or transporting the barges upriver. Waterman and Oceanic relied on Eastern as a company and its personnel, including its supervisors and tugmasters, to perform the tasks which they contracted to perform, the safe navigation and handling of the tow, transporting Waterman's LASH barges, including the LASH barge CG–F70, from its position in the water after discharge from the

GREEN ISLAND to the Haldia buoy in the fleeting area, and then to the Calcutta locks.

The record is similarly devoid of evidence that Waterman and Oceanic had any knowledge or reason to know that Captain Dutta in particular or Eastern in general were incompetent or inadequate to perform the job. Nothing in Oceanic's experience, 8 years, and Waterman's experience, 27 years, with Eastern would have put it on notice of any problems concerning the specific practice which Baron vilifies, the KAMRUP's towage of five loaded barges from Haldia to Calcutta. There is evidence in the record that the KAMRUP had towed five loaded barges in the same manner utilized in this case many times over the years without incident.

The Baron interests suggest that the mere lack of prior accidents does not sanctify the practice and analogized it to sending a blind-folded person to cross the street in traffic, arguing that the fact that it was done without incident many times does not make it safe. While one could agree that an extremely dangerous practice such as the one highlighted by Baron does not lose its negligent quality because no previous accidents occurred, such a practice as sending a blind-folded person to cross a busy street does not equate with the KAMRUP towing five loaded barges from Haldia to Calcutta. No reasonable person would contest that sending a blind-folded person to cross a heavily trafficked street was a negligent practice, but all might agree that such a person ·was extraordinarily lucky that a catastrophe did not occur sooner. On the other hand, Captain Dutta, Eastern's President Singhee, and Mr. Johnson, Waterman's representative, as well as its expert, all of whom have navigation knowledge and experience, find no fault with the practice of the KAMRUP towing five loaded barges from Haldia to Calcutta.

The rights of third parties against the tug and tow are adjudicated separately in accordance with each vessel's respective fault. As noted by Thomas J. Schoenbaum in *Admiralty and Maritime Law:*

> In third party claims, the fault of the tug and the tow are considered separately, and each will be liable to third parties only in proportion to their individual fault. This is despite the fact that for purposes of the navigation rules, a tug and a tow are considered one vessel that must observe the rules as a unit.
>
> When damage is caused by a casualty involving the tow or by the whole flotilla, the courts employ the concept of "dominant mind" to place liability on the tug and to ·absolve the tow from liability. This doctrine holds only that· the vessel is liable whose people are actually in control of the operation, even though the whole flotilla causes the damage.
>
> This rule is not absolute, however; at best it is only a presumption that the tug is responsible as the "dominant mind." If the evidence shows some breach of duty on the part of the tow or an act of negligence that contributed to the casualty, the tow will also be liable....
>
> If the tug and the tow are separately owned, the negligence of the tug cannot be imputed to the tow, and there is neither *in personam* nor *in rem* liability on the part of the tow.

Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 12–7 (3d ed.2001).

The liability of the tow, Waterman's LASH barge, and Waterman's right to exoneration and/or limitation of liability, must be decided independently of the liability of the tug. Baron seeks a determination that Waterman, as the barge owner, is not entitled to limitation because of navigational errors of the tugboat operator in configuring the tow and using a tugboat

which was underpowered. There is simply no legal authority for doing so. The maritime law governing the allocation of liability between tug and tow and exoneration and limitation of liability applicable to these facts weigh against the claim that Baron/U.K. Club asserts here.

Assuming for purposes of these motions only that the tugboat master was negligent in arranging the five barge tow and using the KAMRUP, because it had insufficient power, and further assuming that it was in the navigational channel at the time of the collision, none of these acts can be imputed to Waterman. Waterman discharges LASH barges in ports across the world. It cannot be, nor should it be, expected to follow each tug and tow to its destination to ensure that the tug does its job safely and properly.

█ Again assuming for purposes of this motion that the KAMRUP was negligent or at fault in the collision, under the Limitation of Liability Act[9], a corporate owner of a vessel seeking limitation will absolve itself if it shows that it lacked privity or knowledge. *Kristie Leigh*, 72 F.3d at 481. Mere ignorance will not satisfy the shipowner's burden, as the shipowner is charged "with the knowledge of any of its managing agents who have authority over the sphere of activities in question." *Id.* The Fifth Circuit has recently revisited the question of when limitation is appropriate in *In Re Hellenic, Inc.*, 252 F.3d 391 (5th Cir.2001). While this aspect of Waterman's motion for summary judgment will be studied in detail in connection with Baron's motion on privity or knowledge issues, at this juncture it

must be reiterated that Waterman was the owner of the barge being towed, not the tug, and the barge surely did not commit any navigational errors. Waterman's barge was dumb, unmanned, and had no motive power of its own. If there was any navigational or operational negligence of the tug and tow which contributed to the collision, it was that of the tug.

As noted, the gravamen of the claims against Waterman is that Waterman was negligent. In its Supplemental Memorandum submitted after the depositions of Singhee and Dutta of Eastern and Bhattacharji of Oceanic were taken, Baron explained its position regarding Waterman's negligence:

At oral argument, the Baron interests argued that Waterman's fault was based either on an act of commission or omission. The act of omission occurred if Waterman ignored the contractual provisions which required its agents to approve and supervise the selection of tugs and their use in LASH barge operations as mandated by the applicable contracts. The act of commission occurred if Waterman in approving the selection of the tugs and allowing the KAMRUP to push five loaded LASH barges on repeated occasions, took place with their or their agent's full knowledge and approval. Under either scenario, Waterman is liable. Now that the testimony of the Master of the tug and a witness from Oceanic and Eastern Navigation has been obtained, it is obvious that Waterman and its agents completely ignored its duties and responsibilities under the contracts and the fact that the

---

**9.** The Limitation of Liability Act, 46 App. sec. 183(a) provides that "[t]he liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage,

or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, *without the privity or knowledge of such owner or owners*, shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." *[Italics added]*.

1500 horsepower tug as mandated by the contract, was not in service for over six months prior to the collision. Furthermore, Waterman and its agents failed to approve the tugs or direct Eastern Navigation in the LASH barge operations.

Rec. Doc. No. 457, pp. 2–3.

■ Basically, the Baron interests concede that neither Waterman nor its agents had any knowledge that Eastern's tug KAMRUP towed five barges from Haldia to Calcutta prior to the accident. In such event, the Baron interests suggest that Waterman and/or its agents are at fault because of certain contractual language in the Memorandum of Agreement with Eastern, as follows:

> For the purpose of carrying out the aforementioned towing operation the contractor shall purchase and/or procure suitable tugs *as may be* **approved by the Agents in writing** for the various stages of the operation. The entire operation is required to be performed with the help of three tugs—of which one should be a very powerful one of a capacity of minimum 1500 h.p., **another of a capacity of 500 to 700 h.p. or more** and a third one may be a small launch mainly for moving the said LASH barges from one place to another inside the docks. It is understood that all these tugs will be under **the sole approval of the Agents** as aforesaid.

Exhibits to Waterman's Motion to Dismiss and Alternatively for Summary Judgment, Exhibit 1, attachment C.

The provision is, as Baron suggests, unambiguous. Considering its plain meaning, and the facts, which are not genuinely disputed, there is no basis in it upon which a finding of negligence against Waterman or its agents could be premised. This provision of the agreement requires the contractor, Eastern, to purchase and/or procure suitable tugs "as *may* be approved by the Agents in writing" in order to carry out the towing operation. *May* and *must* have different connotations, but at any rate, the sentence does not **mandate** that Waterman or its agents approve the tugs in writing, but merely allows them to do so. The second sentence requires that Eastern, the contractor, procure three tugs, one which is at least a 1500 horsepower tug, one which is between 500 to 700 horsepower, and a smaller one. Eastern did exactly that—it procured the HOLLAND, which was 1500 horsepower, the KAMRUP, which was 560 horsepower, and a smaller third tug. Waterman and its agents, Oceanic and Marco, were aware that Eastern operated with these tugs, and approved of them. There was no violation of the agreement by Waterman or its agents.

■ Significantly absent from the provision is a requirement that Waterman or its agents approve each and every operation with the tug, or ensure that on every trip from Haldia to Calcutta and *vice versa,* that it must approve the tug, its tow configuration, and the number of barges it planned to tow. Such a provision would have been highly impractical, as Waterman was concerned with its mother ship and its worldwide LASH operations, and placed the towage operations in the capable hands of Eastern. Oceanic, whose employees were on the scene at the time the barges were discharged into the water, was consumed with its innumerable duties outlined previously and left the responsibility and duty of towing the barges safely from Haldia to Calcutta in the hands of the party who contracted to perform it, Eastern. There is no evidence that Waterman or its agents breached any duty in the Eastern Memorandum of Agreement and it affords no basis upon which to hold Eastern liable or to deny limitation or exoneration. While there is a question of fact relative to

Eastern's negligence, irrespective of that, there is no question that Waterman is entitled to exoneration respecting its liability as the owner *pro hac vice* of the LASH barge CGL–F70.

*Baron's Motion for Summary Judgment on Principal Agent Relationships*

In an effort to circumvent the limitation/exoneration rules, Baron moves for summary judgment on the status of Marco Shipping, Oceanic, and Eastern as agents for Waterman. The documents and the evidentiary support by way of affidavits and deposition excerpts in the record leave no dispute that Marco Shipping was Waterman's General Agent in Southeast Asia and Oceanic was Waterman's Port Agent in Calcutta, India. Eastern was the tugboat contractor Waterman contracted with to tow its LASH barges up Hooghly River from Haldia to Calcutta.[10]

Baron suggests that because Marco and Oceanic were the General Agent and the Port Agent for Waterman in Southeast Asia and India respectively, they are the legal equivalents of "managing agents" for purposes of the Limitation of Liability Act and for purposes of vicarious liability.

■ In order to be "managing agents" such that the privity or knowledge of the agents will act to deny Waterman's right to exoneration or limitation, both Marco and Oceanic would have to have authority over the specific sphere of activities which results in liability. *Kristie Leigh*, 72 F.3d at 481. In order for Waterman to be imputed the negligence or knowledge of Eastern to deny it limitation in these circumstances, (1) Eastern would have to be an agent of Waterman so as to subject Waterman to liability for Eastern's

acts; and (2) Captain Dutta would have to be a managing agent of Waterman, i.e., "an executive officer, manager or superintendent whose scope of authority included supervision over the phase of the business out of which the loss or injury occurred," and whose authority "extended to the basic business decisions made by the . . . supervisors and the president of the company." [11] Certainly, there is no evidence in the record that Eastern was an agent of Waterman or that Captain Dutta of Eastern was a "managing agent" of Waterman.

■ The only other possibility which Baron suggests is that the privity or knowledge of Oceanic or Marco, admittedly agents of Waterman, deprives Waterman of the right to limitation of liability. Oceanic and Marco, however, plainly did not have authority over the sphere of operations out of which the accident occurred, i.e., the navigation of the tug or the safe handling of the barges on their journey up the Hooghly River. In order for Oceanic and Marco to be managing agents in this respect, Waterman would have had to place this responsibility on Marco for every port in its territory and on Oceanic for every trip up the river made by an Eastern tug.

There is no evidentiary support for this leap of logic. Marco and Oceanic had specific duties delegated to them in the Liner Agency Agreements which they entered. Neither of these ship's agents were responsible for the safe navigation of the barges. That responsibility lay solely with Eastern. As observed by the Fifth Circuit in *Cupit v. McClanahan Contractors, Inc.,* 1 F.3d 346 (5th Cir.1993):

> mary Judgment on Waterman's Status as Time Charterer of the Tug KAMRUP.

**10.** Whether or not the contract between Waterman and Eastern was a time charter or a towage contract will be discussed in connection with Baron's Motion for Partial Sum-

**11.** *Cupit v. McClanahan Contractors, Inc.,* 1 F.3d at 348.

[A] vessel owner seeking limitation of liability must prove that it lack privity or knowledge of the negligence. *See Brister v. AWI, Inc.,* 946 F.2d 350, 359 (5th Cir.1991); *In re Farrell Lines, Inc.,* 530 F.2d 7, 10 (5th Cir.1976).

"Privity or knowledge" sometimes described as "complicity in the fault," *Brister,* 946 F.2d at 356, extends beyond actual knowledge to knowledge that the ship owner would have obtained by reasonable investigation. *Id.* at 358.

For the purposes of limitation, a corporation is charged with the privity or knowledge of its employees when they are sufficiently high on the corporate ladder. The Supreme Court in *Coryell v. Phipps,* 317 U.S. 406, 410, 63 S.Ct. 291, 293, 87 L.Ed. 363 (1943), stated that privity or knowledge is imputed to the corporation when the employee is "an executive officer, manager or superintendent whose scope of authority included supervision over the phase of the business out of which the loss or injury occurred."

In *Continental Oil Co. v. Bonanza,* 706 F.2d 1365 (5th Cir.1983) (en banc), we rejected the assertion that the navigational negligence of a master who also occupies a managerial position in a corporation will automatically deprive the corporation of the right to limit its liability. 706 F.2d at 1376. The fact that a ship's master has been given broad and unlimited agency powers over the operation and maintenance of the vessel is insufficient to impute the master's mistake to the shipowner. *Id.* Rather, the dispositive question is whether the corporate employee is a "managing agent"

with respect to the field of operations in which the negligence occurred."

1 F.3d at 348; (bold emphasis added).

In *Cupit,*[12] a derrickman aboard a movable drilling rig (a vessel) was severely injured when he was bleeding air pressure through the fill-up line. The rig owner's top supervisor on the rig, the toolpusher, admitted at trial that he knew that the method being used by the derrickman was unsafe and could cause injury. The district court denied limitation to the vessel owner, finding that the toolpusher was a managing agent of the vessel owner over the sphere of operations in which the injury occurred, namely drilling activities. The Fifth Circuit reversed this court, finding:

> The district court found that [the toolpusher] supervised all operations aboard Rig No. 8 and had the authority to control every operation thereon. We will overturn the district court's findings only if they are clearly erroneous. "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *Transorient Navigators Co. v. M/S Southwind,* 714 F.2d 1358, 1364 (5th Cir.1983). We are left with such a conviction in this case. **While Samples, as toolpusher, had significant authority over the drilling job then in progress, his corporate position was insufficiently high and the scope of his authority was concomitantly inadequate to impute his knowledge to the corporation for the purpose of denying limitation of liability.**
>
> [The toolpusher] admittedly had "authority over all phases of operations on

---

**12.** The facts are well-known to the undersigned as *Cupit* was tried in this section of court.

Rig No. 8." But the circumstances led the district court to overstate the scope of [the toolpusher's] authority. As long as the vessel was stationary and drilling, [the toolpusher] had authority over the drilling job. But so did nine other toolpushers on any shift if each of [the shipowner's] nine other rigs was operating. Moreover, when that drilling job was over, Samples had no say about when and where the next drilling job would begin. For the duration of any particular drilling job, [the toolpusher's] job was to oversee the drilling on one rig on a shift basis. **But his authority did not extend to the basic business decisions made by drilling supervisors and the president of the company.**

**Because [the toolpusher's] role and the scope of his authority were relatively limited,** the district court's finding that [the toolpusher] was a managing agent is clearly erroneous. *See Continental Oil Co., supra.* **His negligence could not be attributed to the shipowner to deny limitation of liability.**

1 F.3d at 348–49 **(bold emphasis added).**

More recently, the Fifth Circuit again examined the question of when a corporate employee's "privity or knowledge" will defeat the corporate owner's entitlement to limitation in *In re Hellenic, Inc.,* 252 F.3d 391 (5th Cir.2001). In the *Hellenic* decision, the Fifth Circuit observed that the *Cupit* rule which established that privity or knowledge "is imputed to the corporation when the employee is 'an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred,' " is a reflection of agency law. *Id.* at 348. *Hellenic* noted that while in the case of a corporation, "the privity and knowledge of individuals at a certain level of responsibility must be deemed the privity or knowledge of the organization, 'else it could always

limit its liability,' " the limitation of liability rule also accounts for scope of an owner's control over its agents. *Id.* at 395–96. In making this observation, the court specifically recognized the case of a shipowner's liability for the navigational errors of the master, stating:

> Thus, a master's navigational errors at sea are generally not attributable to the owner. When the owner is so far removed from the vessel that he can exert no control over the master's conduct, he should not be held to the master's negligence. In such cases, the owner may rely on the master's skill and experience.

*Id.* at 396. Such a rule is particularly appropriate under the facts of this case.

The *Hellenic* court also adhered to the rule that even though a corporate employee is a supervisor who has authority over a vessel and can decide, for instance, whether and under what circumstances a barge would remain in the field overnight, unless the employee's authority extended to the basic business decisions made by the company's supervisors and president, such as when and where the next project would be, and could enter into contracts, determine pricing, hire and fire other employees, he did not possess managing authority over "the field of operations in which the negligence occurred." *Id.* at 396. In such circumstances, the shipowner will be entitled to limit because the corporate employee was not a "managing agent" whose privity or knowledge is sufficient to deny limitation of liability.

Under the criteria established by *Hellenic* and by *Cupit,* certainly Oceanic, Eastern, and Waterman cannot be "managing agents" over the sphere of operations out of which any potential liability lies as concerns this collision. Oceanic had a specific set of duties assigned to it pursuant to the Liner Agency Agreement. It

was not responsible to ensure safe navigation of the barges and its authority did not extend to the basic business decisions by Waterman. There is no factual basis upon which Eastern's employees could be found to be "managing agents" of Waterman so as to impute any liability on its part to Waterman. While Mr. Shahani of Marco Shipping is also an employee and officer of Waterman, his authority is limited to those activities specified in the Marco agency agreement, none of which included responsibility for navigation decisions or safe handling of the barges. Shahani worked in Singapore and was not in India when the barges were offloaded from the mother ship and when they were towed from Haldia to Calcutta.

Further, to the extent any of the agency contracts required either Marco or Oceanic to supervise the activities of Eastern, there are no facts in the record which suggest that Waterman, Marco, or Oceanic had any reason to known that Eastern's actions relative to the KAMRUP's towage of Waterman's CGL LASH barges, or its configuration of the tow, were negligent, if indeed such actions were limited. Marco and Oceanic were not tugboat operators or marine surveyors. They were ship's agents. They had no control over the actions of the master of the tug. Waterman offloaded its LASH barges from its LASH mother ship, the GREEN ISLAND, and departed port, leaving it to the tugboat operator to tow the barges, as it does throughout the world. The extensive experience of Waterman, Oceanic and Marco with Eastern as its towage contractor and barge handler was unblemished. There are no facts in the record upon which Waterman or its agents could be determined negligent in their supervision of Eastern, as the contract and practicalities limit the role that Waterman and its agents have relative to the transportation of the barges once they are offloaded.

The agreement between Waterman, or its agents, and Eastern, provides unambiguously that the responsibility for the safe handling and safe navigation of the barges is Eastern's. The agreement itself specifies that "[t]he Contractor shall ensure safe towing and handling of the barges in tow." Paragraph 9, Memorandum of Agreement between Waterman and Eastern, Mar. 21, 1974. This is the only construction of the agreement which makes sense and it comports with the realities of marine shipping and transportation.

The evidence surrounding the relationship between Waterman and Eastern is susceptible to only one interpretation, i.e., that Eastern was an independent contractor of Waterman, not an agent. The Memorandum of Agreement entered into in 1974 and extended several times demonstrates that the parties had a contract which was negotiated and re-negotiated numerous times. The work being performed, the towage of barges, was specified in the contract, and Waterman did not leave one of its employees to oversee the towage operations, but turned over the job to Eastern. The contract was for a specified duration, was not terminable at will, and the compensation was delineated in the agreement. *See, Moore v. Pride Offshore, Inc.,* 1999 WL 1005717 (Livaudais, J.) (E.D.La.1999) and *Hickman v. Southern Pacific Transport Co.,* 262 La. 102, 262 So.2d 385 (1972). Generally, a principal is not liable for the negligence of an independent contractor who is acting pursuant to the contract. *Calloway v. CNG Producing Co.,* 1999 WL 447451 (Porteous, J.) (E.D.La.1999), *citing Graham v. Amoco Oil Co.,* 21 F.3d 643, 645 (5th Cir.1994) and *Bartholomew v. CNG Producing Co.,* 832 F.2d 326, 329 (5th Cir. 1987). Unless a principal issues an express or implied order to the contractor to engage in an unsafe work practice leading

to an accident, a principal cannot be held liable for the negligence of an independent contractor performing the work specified in the contract. *Coulter v. Texaco, Inc.,* 117 F.3d 909, 912 (5th Cir.1997).

■ While these cases are applying Louisiana law, the same policy applies in maritime cases as well. Absent any negligence on the part of the shipowner in selecting the independent contractor or in continuing to use the independent contractor, such as a ship's physician, the carrier cannot be held liable for the independent contractor's negligence. *Barbetta v. S/S Bermuda Star,* 848 F.2d 1364, 1372 (5th Cir.1988).

The Court has painstakingly reviewed mounds of evidence in the form of affidavits, deposition excerpts, entire depositions, documents, and other exhibits. The Court finds no basis upon which to conclude that Waterman was negligent in either contracting with or retaining Eastern to tow its barges from Haldia to Calcutta. The two companies had a long-standing relationship without incident until the collision at issue here. The KAMRUP had towed five LASH barges from Haldia to Calcutta on many occasions uneventfully. Waterman and its agents, Oceanic and Marco, had no reason to suspect that Eastern was performing its towing services in any other manner than that required in the contract, and had no cause to believe that the tow was made up in an unsafe manner or that the KAMRUP was not sufficiently powered for the job.

Waterman does business world-wide and contracts with countless independent contractors in ports far removed from its base of operations in New Orleans. Neither law, sound policy, or logic would dictate a finding that, absent some complicity or fault on its part, that it be held liable for the fault of an independent contractor Waterman hired to tow barges. To do so would place an unreasonable and untena-

ble burden on shipping companies. Certainly Baron/U.K. Club has not furnished the Court with any authority holding a shipping company liable in circumstances such as these.

*Motion of Baron for partial summary judgment on the status of Waterman as time charterer of the Tug KAMRUP*

Baron seeks partial summary judgment on the status of Waterman as a time charterer of the Tug KAMRUP. Baron alleges that Waterman is the time charter of the Tug KAMRUP and under the laws of India, the United Kingdom, and the United States, a time charterer may be liable to third parties for damages arising out of its own negligence. Waterman denies that its agreement with Eastern was a time charter and argues that the arrangement with Eastern was a towage contract.

■ Before addressing the question of the nature of the agreement between Waterman and Eastern, it must be observed that regardless whether the agreement is a towage contract or a time charter, in order to prevail, Baron must prove that Waterman itself was negligent and that its negligence was a cause of the collision. The rule applicable to the liability of a time charterer of a vessel for vessel negligence was discussed in *In the Matter of P & E Boat Rentals, Inc.,* 872 F.2d 642 (5th Cir.1989). Respecting a time charterer's liability, the Fifth Circuit held:

We agree that a time charterer "who has no control over the vessel, assumes no liability for negligence of the crew or unseaworthiness of the vessel absent a showing that the parties to the charter intended otherwise." *Mallard v. Aluminum Co. of Canada, Ltd.,* 634 F.2d 236, 242 n. 5 (5th Cir.), cert. denied, 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981). However, this general rule does not exempt a time charterer from liabili-

ty if it is negligent in conducting its activities as time charterer. In *Graham v. Milky Way Barge, Inc.*, 811 F.2d 881 (5th Cir.1987), we upheld a judgment against Chevron, which was there, as here, found negligent, not as owner or operator of a vessel, but as time charterer. Our reasoning in *Graham* applies with equal force to this case:

> Chevron cites many cases, both in this Circuit and others, where the time charterer was not held liable for the unseaworthiness of a chartered vessel or the negligence of its crew. Chevron's argument, however legally sound it may be, is inapposite to the findings by the district court. The district court found not that Chevron was responsible for any unseaworthiness of the vessel or negligence on the part of the crew but that Chevron's negligence was independent of any arising from the maintenance and operation of the [vessel].

811 F.2d at 892–93.

872 F.2d at 647. The *P & E Boat Rentals* action was also a limitation proceeding involving the collision between two crewboats in heavy fog resulting in the tragic death of four passengers (one by decapitation) and serious injury to five others.[13] The dramatic evidence upon which Chevron as time charterer was found liable was the testimony by several crewboat owners, including that of the sole survivor of the collision, that the Chevron dispatcher routinely demanded that the crewboats operate at high speed in heavy fog to deliver the crew or suffer the consequences, i.e., termination of the contract. 872 F.2d at 647.

By contrast, there is no evidence in this record to support any finding that Waterman was negligent in some way, either as a time charterer, if it was, or a party to a towage contract, that played any part in causing the collision. Regardless of the nature of the contract between Waterman and Eastern, all responsibility for the navigation of the tug and the safe handling of the barges was placed on Eastern. Waterman did not assume any responsibility to dictate conditions or methods of towage, nor did its agents, Oceanic and Maroc, but engaged Eastern to tow its barges up the Hooghly to Calcutta and to be responsible for towage and safe handling of its barges. It is an arrangement that was ongoing since 1974 without incident until the June, 1997 collision in question. Thus, regardless of the classification of the agreement, there is no basis in the record to find Waterman independently negligent in conducting its activities as either a time charterer or a barge owner party to a towage contract.

Inasmuch as Baron seeks a partial summary judgment finding that Waterman was the time charterer of the tug KAMRUP, the legal import of the parties' agreement shall be examined. The original agreement which Waterman and Eastern entered into was entitled "Memorandum of Agreement" and was dated March 21, 1974. Throughout the original "Memorandum of Agreement" reference is made to towage and the towing of Waterman's LASH barges. The preamble to the agreement provides:

> *AND WHEREAS* the said Principal has approached the said contractor [Eastern] for undertaking the **towage** work of the **LASH barges** i.e. to receive the **LASH barges** from the said Mother Ship, to tow them into some fleeting area or areas in or around Haldia and to **bring them** inside the Calcutta Docks—

---

**13.** The Court is also very familiar with the facts underlying *P & E Boat Rentals* as it was tried by the undersigned.

Nataji Subhas Docks or Kidderpore Docks or any other places as may be found suitable from time to time under the directions of the Agents, holding the said **barges** in the fleeting area and **to move them** to the loading and unloading points as directed and **to take them back** under the direction of the Agents to Haldia fleeting area and ultimately for **loading them** on the said Mother Ship.

**(Emphasis added).**

While the intent of the parties is often nebulous, the preamble to this agreement expressly provides that Waterman approached Eastern not to time charter a specific vessel or tugboat, but "for undertaking the **towage** work of the LASH barges i.e. to receive the LASH barges from the said Mother Ship, to **tow** them into some fleeting area or areas in or around Haldia and to **bring them** inside the Calcutta Docks ..., **holding the barges** in the fleeting area and **to move them** to the loading and unloading points as directed and **to take them** back under the direction of the Agents to Haldia fleeting area and ultimately for **loading them** on the Mother Ship." The preamble continues by stating "*AND WHEREAS* the said Contractor has agreed to undertake this work on the following terms and conditions." The term "this work" refers not to the use of a specified vessel in the preceding paragraph, but to the towage of Waterman's barges. As can be seen, the language used focuses on the barges and their movement, and not on any particular tug.

Following the preamble, the contract specifies that Eastern is to have three tugs available of certain horsepower to perform the work, shall insure the tugs fully, including for that of third party liability [14],

and shall not employ the tugs to tow any other LASH barges other than those owned or chartered to Waterman. Inasmuch as Waterman is the only LASH operator in the world, this clause was basically without meaning, since there were no other LASH operators for whom the tugs could be utilized. The contract specifies that the tugs could be used for other work when not being used to tow Waterman's LASH barges, with Waterman's permission. As a practical matter, the tugs were used for other purposes and to perform other work when not being utilized for Waterman's LASH barge operation without seeking permission. Waterman sought to ensure that the tugs would be available for its LASH barge operation when the mother ships arrived, because the mother ships often stayed in port only one to one and one-half days, were traveling around the world on a monthly basis, and Waterman did not want the barge operation to be delayed because the tugs were being used on other jobs. There is no evidence that Waterman or its agents ever attempted to dictate to Eastern what its tugs could do when they were not engaged in LASH barge operations for Waterman.

Paragraph 4 lists the ordinary means in which Eastern will conduct its barge operations. The list of barge operations is explicitly limited to towing the LASH barges. There was no other use for Eastern's tugs other than to receive the LASH barges upon discharge from the mother ship, safely handling and controlling them in the water, towing them to a fleeting area in Haldia, towing the LASH barges to a fleeting area in the Calcutta docks, moving them for loading and unloading purposes, and towing them back to Calcutta to be reloaded on the mother ship, according

**14.** No claim has apparently been filed by the owners of the GREEN OPAL against Eastern's insurer in India.

to schedule. The Memorandum Agreement specifies plainly that it is Eastern's responsibility to ensure safe towing and handling of the barges in tow.

██ Construction of a maritime contract is governed by maritime law. *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538 (5th Cir.1986). The court in *Moore v. Phillips Petroleum Co.*, 912 F.2d 789 (5th Cir. 1990) reviewed the unique characteristics of a time charter agreement:

Under the traditional time-charter agreement, the time charterer directs the vessel's commercial activities. It may designate the cargo to be carried and determine the vessel's routes and destinations. *See* G. Gilmore & C. Black, *The Law of Admiralty* § 4–1 at 194 (2d ed.1975). We have therefore indicated that a time charterer might be liable for choosing an unsafe combination of cargo in the same hold. *See Kerr–McGee*, 830 F.2d 1332, 1341. A time charterer may also be liable for directing the vessel to encounter natural conditions like hurricanes or treacherous seas. *See, e.g. Graham v. Milky Way Barge, Inc.*, 824 F.2d 376, 388 (5th Cir. 1987) (upholding finding that, under the circumstances, time charterer was liable for death and injury resulting from capsizing because time charterer sent vessel into unsheltered water and failed to broadcast weather information); *Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1041–42 (5th Cir.1983) (holding time charterer liable for injury resulting from decision to continue unloading operations in treacherous weather conditions); *Offshore Logistics Services, Inc. v. Mutual Marine Office, Inc.*, 462 F.Supp. 485, 490 (E.D.La.1978) (holding time charterer liable for injury to passenger during navigation in rough seas when time charterer decided to encounter the weather).

The time charterer's duties are different from the vessel owner's duties. The vessel owner remains responsible for the seaworthiness of the vessel, *e.g. Nichimen Co. v. M.V. Farland*, 462 F.2d 319, 331 (2d Cir.1972), dangerous conditions on board, *e.g., Migut v. Hyman–Michaels Co.*, 571 F.2d 352, 356 (6th Cir. 1978), navigational errors by the pilot and negligence of the crew, *e.g. Delta Transload, Inc. v. MV Navios Commander*, 818 F.2d 445, 451 (5th Cir. 1987), and a reasonably safe means of access for those boarding or leaving the vessel, *see, e.g. Tittle v. Aldacosta*, 544 F.2d 752, 755 (5th Cir.1977).

912 F.2d at 792.

By contrast, the court in *Agrico Chemical Co. v. M/V BEN W. MARTIN*, 664 F.2d 85 (5th Cir.1981) explained the hallmarks of a towage contract:

Barges are vessels, but of a peculiar kind. Lacking power and usually crew, barges depend upon another vessel, a tug, for movement. A contract for a tug to move a barge is one of towage. The tug is neither a bailee nor an insurer of the tow. The tug is, however, obliged to use " 'such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." '

A towage contract, imposing the duties we have described, arises when one vessel is employed to expedite the movement of another. If, however, the tug is engaged to do more than merely tow another's vessel, the contract is considered one for the movement of the tow and its contents, a contract of affreightment, subject to the more exacting duties applicable to those who undertake as carriers to transport cargo… Thus, "when a tug and barge are owned by the same person (or when either the tug or barge are bareboat-chartered to the same person) and are utilized, by con-

tract, to tow **cargo** from one point to another, the contract is one of affreightment and not towage."

\* \* \* \* \* \*

Whatever the nature of the vessel, the rules concerning the responsibility for its operation are the same. If the owner retains control, he remains liable for all damages arising out of its operation whether the charter be only for a single voyage ("voyage charter") or for a fixed time ("time charter"). If the charter is a demise [which is "tantamount to, though just short of, an outright transfer of ownership"], the charterer is responsible. **The charter may describe the duties of the parties and provide for the shifting of risks between them, but, in general, control entails responsibility for fault.**

644 F.2d at 90–91 (citations omitted) **(bold emphasis added)**. *See,* A. Parks, *Law of Tug, Tow and Pilotage* 4, 22 (1971); *Southwestern Sugar and Molasses Co. v. River Terminals Corp.,* 360 U.S. 411, 417–18, 79 S.Ct. 1210, 1215, 3 L.Ed.2d 1334 (1959).

■■■ The Memorandum of Agreement and extensions did contain a term, generally three years. The tugs employed by Eastern to tow the vessels were not used for any purpose other than to tow the LASH barges discharged from the LASH mother ships. If the HOLLAND, the large 1500 horsepower tug, was unable to tow the barges, Eastern had to substitute another vessel to tow the barges. Thus,

the contract was not dependent on a specific tug for a specific voyage or number of days, but required that Eastern have three tugs available to tow the LASH barges up and down the Hooghly, and within the fleeting area, as required. The entire character of the contract reflects the intent that Eastern provide towing services for the Waterman CGL LASH barges during the term of the contract. Under these circumstances, the Court finds that the agreement between Waterman and Eastern was a towage contract and not a time charter.[15]

### Conclusion

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material issue of fact and that the moving party is entitled to a judgment as a matter of law." As recognized by the Supreme Court,

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of

---

15. As previously noted, however, even if Waterman were to be found to be a time charterer, the claimant must establish that it was independently negligent in causing the collision. The record is devoid of evidence that Waterman directed the specific movements of the tug KAMRUP in June, 1997, or previously, required them to engage in any hazardous actions, specified that they configure the tow so that five barges be towed in tandem, or demanded that the KAMRUP be utilized to tow the barges that day. There is similarly no evidence that the KAMRUP had ever had difficulty in accomplishing the same towing job it was performing on the day in question, or that the Master of the tug was in any way unfit or incompetent, or, most importantly for a negligence determination, that Waterman ever knew or should have known of these facts, so as to subject Waterman to time charterer liability.

proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. "[T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a). . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

*Celotex Corporation v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *Accord, Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir.2000). When a summary judgment motion is filed by a party seeking to defeat a claim filed against him, the "party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514 (1986). To defeat a summary judgment motion, the plaintiff must present affirmative evidence, "even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Id.*

In this proceeding, Waterman, as limitation/exoneration petitioner, seeks summary judgment dismissing all claims against it in this limitation/exoneration of liability suit, and also seeks summary judgment dismissing claims of the Baron interests against it in the consolidated suit. The parties have been afforded ample opportunity to conduct discovery, as this suit has been pending for four years and voluminous discovery requests have been filed by the parties, dozens of depositions taken not only in this district, but also in India and Norway. Despite the extensive discovery which has been taken, the claimants have failed to identify facts sufficient to hold Waterman liable for the June 19, 1997 collision of the GREEN OPAL and the LASH barge CG–F70, being towed by Eastern's Tug KAMRUP, and its resulting damages. The facts have not demonstrated that Waterman or its agents Oceanic and Marco were negligent or that any negligence on their part was a cause of the collision. Nor have the facts or applicable law established that Waterman, or its agents Oceanic and Marco, were legally responsible for any negligence on the part of Eastern or Tugmaster Dutta who was at the command of the KAMRUP.

Accordingly,

**IT IS ORDERED** that the motion of R.L. Baron that it intends to raise issues concerning the laws of India be and is hereby **GRANTED IN PART** to the extent that it requests a determination that the Indian Rules of Inland Navigation are applicable to a determination concerning the fault of the GREEN OPAL and the KAMRUP in the collision, but **DENIED** in all other respects;

**IT IS ORDERED** that the motion of Waterman for summary judgment on all claims asserted against it be and is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the motion of R.L. Baron, Mashiro Toyoda, Hajime Ono, Tashiaski Taekuchi, Dooyang Line Co., Dooyang Ship Management Co., and United Kingdom Protection and Indemnity Assurance Association (Bermuda, Ltd.), for partial summary judgment on principal-agent relationship or privity or knowledge issues be and is hereby **GRANTED IN PART** insofar as it seeks a determination that Marco Shipping was at all relevant times Waterman's general ship's agent and Oceanic Shipping Agency

Pvt. Ltd. was at all relevant times Waterman's local ship's agent in Calcutta and Haldia, India, and is **DENIED** in all other respects;

**IT IS FURTHER ORDERED** that the motion of R.L. Baron for partial summary judgment on the status of Waterman as time charterer of the Tug KAMRUP be and is hereby **DENIED.**

Judgment shall be entered exonerating Waterman and dismissing all claims brought against it in these consolidated proceedings.